### In re XEROX CORPORATION SECURITIES LITIGATION

#### No. 3:99CV02374(AWT).

United States District Court, D. Connecticut.

Sept. 28, 2001.

J. Daniel Sagarin, Elias A. Alexiades, Margaret E. Haering, Hurwitz & Sagarin, Milford, CT, Steven G. Schulman, Keith M. Fleischman, Cary L. Talbot, Francis P. Karam, Milberg, Weiss, Bershad, Hynes, & Lerach, New York, NY, for Helene Giaraputo, Seymour Lazar.

J. Daniel Sagarin, Elias A. Alexiades, Hurwitz & Sagarin, Milford, CT, for Mark Goldman, Jerry Krim, Hubert Dean Moore, Michael Metrapole, Avi Gletzer, Max Wilinski, Sheryl Ann Hesano, Gerard P. Woods, Phil Don Astrolio, Victor Faraci, Daniel Schwartz.

Elias A. Alexiades, Hurwitz & Sagarin, Milford, CT, for Lorene Collier.

Andrew M. Schatz, Schatz & Nobel, Hartford, CT, for Marty Radwell, Adele Brody, Robert Weiss.

Gregory Michael Egleston, Schatz & Nobel, Hartford, CT, for Shalom Mehler.

Ivy Thomas McKinney, Xerox Corp., Stamford, CT, Keith P. Carroll, Mintz, Levin, Cohn, Ferris, Govsky & Popeo, P.C., Boston, MA, James F. Stapleton, Jonathan B. Tropp, Day, Berry & Howard, Stamford, CT, for Xerox Corp.

Jay B. Kasner, Michael Gruenglas, Skadden, Arps, Slate, Meagher & Flom, New York, NY, James F. Stapleton, Thomas D. Goldberg, Jonathan B. Tropp, Terence J. Gallagher, III, Day, Berry & Howard, Stamford, CT, for Barry Romeril, Paul A. Allaire, Richard Thoman.

*RULING ON MOTION TO DISMISS*

THOMPSON, District Judge.

The plaintiffs bring this class action on behalf of all persons who purchased common stock from Xerox Corporation ("Xerox") during the period from October 22, 1998 through October 7, 1999, seeking redress for alleged violations of the Securities Exchange Action of 1934 (the "Exchange Act"). The plaintiffs bring their claims under Sections 10(b) and 20(a) of the Exchange Act, respectively 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated by the Securities and Exchange Commission ("SEC") pursuant to Section 10(b). The defendants, Xerox Corporation ("Xerox") and three executive officers of Xerox, have moved to dismiss the plaintiffs' amended consolidated complaint for failure to state a claim. For the reasons set forth below, the defendants' motion to dismiss is being denied.

## I. *Factual Background*

For purposes of this motion, the court accepts as true the plaintiffs' factual allegations as set forth in the complaint.

The plaintiffs are individuals or entities who purchased Xerox common stock during the period from October 22, 1998, when Xerox first claimed that it was benefitting from a restructuring, through October 7, 1999, when Xerox disclosed that the restructuring had resulted in problems that were affecting its operations and revenues. The complaint alleges that the defendants are: Xerox, a New York corporation with its executive offices located in Stamford, Connecticut, which is publicly traded on the New York Stock Exchange; Paul Allaire ("Allaire"), who "has served as Chairman of the Board of Directors since May 1999, Chief Executive Officer from May 1991 to April 1999, Chairman of the Executive Committee, and a Member of the

Board of Directors since 1986[ ]", Compl. ¶ 15a; Richard Thoman ("Thoman"), who "has served as President and Chief Operating Officer since June 1997, Chief Executive Officer since April 1999, a Member of the Executive Committee, and a Member of the Board of Directors since June 1997[ ]", Compl. ¶ 15b; and Barry Romeril ("Romeril"), who "has served as Executive Vice President and Chief Financial Officer since 1993, Vice Chairman of the Board of Directors since April 1999 and a Member of the Board of Directors since April 1999." Compl. ¶ 15c.

From 1995 through 1998, the price of Xerox's common stock consistently increased. However, at the end of 1998, the document processing market shifted from old-style copiers to new digital models, and Xerox's traditional dominance of the market was threatened. Analysts had noted the need on Xerox's part to cut costs. In connection with an effort to become more competitive, Xerox announced, on April 7, 1998, that it would engage in a restructuring of its operations. Xerox stated in a press release, among other things, that in connection with the restructuring, it would be closing one of its four geographically organized customer administrative centers in the United States and organizing the three remaining centers by customer segment. Xerox planned to lay off 11% of its workforce in the process. Xerox claimed, among other things, that this restructuring would achieve significantly greater productivity and result in an increased speed of response to the marketplace. Xerox estimated that there would be pre-tax savings of approximately $1 billion annually as a result of the initiatives.

Xerox's restructuring was much more widespread than the defendants had told investors. Although Xerox stated that it was closing one of four customer adminis-

trative centers in the United States, in reality, it consolidated 36 regional centers into three facilities. These facilities had to provide the same nationwide service as had previously been provided by the 36 regional centers, but were staffed largely by inexperienced and unskilled employees. The reduced number of customer administrative centers and the inexperienced staff could not perform the tasks necessary for or required by the restructuring. Consequently, throughout the second part of 1998, and all of 1999, Xerox experienced operational difficulties that materially affected its operations, customers and sales. For example, inexperienced and unskilled employees were unable to process in a timely fashion the volume of sales orders that had been processed by their skilled predecessors. Substantial delays and customer dissatisfaction become the norm.

The absence of skilled employees at the three customer administrative centers also affected Xerox's sales force, which had to take on tasks for which it had not been trained, namely, the processing of paperwork and tracking of customer orders. These additional duties distracted members of the sales force from their sales duties. As a result, Xerox's sales began to slow.

By the beginning of the class period in October 1998, the restructuring had generated problems that not only undermined Xerox's operations, but affected customer purchases as well. These problems included delayed deliveries and improper follow-up service, canceled orders, and reduced revenue caused by substantial discounts given to dissatisfied customers in order to retain their business. Many customers switched to Xerox's competitors because they were dissatisfied with Xerox's lack of customer service and inability to deliver equipment within a reasonable time frame.

Throughout the class period, any short-term savings Xerox realized as a result of the restructuring were substantially outweighed by these operational problems and their adverse impact on Xerox's customers and sales. These problems were not disclosed to the investing public. Rather, throughout the class period, the individual defendants made statements about the positive effects of Xerox's restructuring, while concealing its material negative impact on the company's operations, customers and sales. The individual defendants claimed, among other things, that operating profit margins had improved; that Xerox was realizing the cost-saving benefits of the restructuring; that Xerox's sales force was energized and motivated, and the focus of the entire organization was on getting in front of the customer, and that sales development included in-depth training; that Xerox's second quarter 1999 revenue would rise by five percent; that Xerox would experience annual per share earnings growth in the mid-to-high teens in 1999 and beyond; that Xerox had fixed most of its sales realignment problems; and that the restructuring was going according to plan.

The defendants also conveyed, throughout the class period, their representations to the market through analysts, who were specifically provided information with the defendants' understanding and expectation that they would republish it. Following the issuance of the above-described statements by the defendants, analysts stated that the restructuring, among other things, was successful and on track to be completed, would assist Xerox in meeting double-digit earnings targets, enabled Xerox to grow its sales while cutting costs, provided cost savings that would help Xerox weather the Asian and Brazilian economic crises, would enable Xerox to meet Wall Street's earnings expectations, and had enabled Xerox to stun its competition; they also

stated that problems arising out of the reorganization of Xerox's sales force had been mostly fixed in May 1999 and that the company was on course to meet earnings expectations.

In January 1999, the defendants portrayed the restructuring as a success and announced, on January 6, 1999, that Xerox was building on this success by realigning its sales force into four operating groups, changing it from a geographical orientation to a vertical industry-based organization. In fact, throughout most of the country, this realignment did not begin until after the class period ended. The price of Xerox's common stock rose in response to the defendants' representations.

In January and February 1999, twelve Xerox insiders, including the three individual defendants, sold significant amounts of Xerox stock. Defendant Allaire received gross proceeds of over $11.8 million from his stock sales. Defendant Thoman received gross proceeds of approximately $18.4 million from his stock sales. Defendant Romeril received gross proceeds of approximately $1.2 million from his stock sales.

On October 8, 1999, two weeks following assurances by Xerox to investors that the restructuring was proceeding according to plan, Xerox announced that its third quarter results would fall materially short of analysts' expectations that it had endorsed weeks earlier. The defendants admitted that the restructuring had had a detrimental impact on the company, and that sales productivity had been adversely affected by the ongoing impact of the restructuring. That day, Xerox stock was the most heavily traded on the New York Stock Exchange, falling by more than 25% in response to the news, to $31.75 per share, or down approximately 50% from the stock's high during the class period.

## II. *Legal Standard*

### a. Rule 12(b)(6)

Dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted is not warranted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The task of the court in ruling on a Rule 12(b)(6) motion "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir.1984) (internal quotation marks and citation omitted). The court is required to accept as true all factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff. *See Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.1994). However, "[w]hile the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice." *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir.1996). *See also DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir.1996) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)."); *Furlong v. Long Island Coll. Hosp.*, 710 F.2d 922, 927 (2d Cir.1983) (noting that while "*Conley* permits a pleader to enjoy all favorable inferences from facts that have been pleaded, [it] does not permit conclusory statements to substitute for minimally sufficient factual allegations.").

### b. Rule 9(b) and the PSLRA

Allegations of securities fraud under § 10(b) of the Exchange Act and Rule 10b–5 are subject to the pleading requirements of Federal Rule of Civil Procedure

9(b): "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b) (2001). "A complaint making such allegations must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1127–28 (2d Cir.1994) (internal citations omitted).

In 1995, Congress amended the Exchange Act through passage of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See* Pub.L. No. 104–67, 109 Stat. 737 (codified at 15 U.S.C. §§ 77k, 77i, 77z–1, 78a, 78j–1, 78t, 78u, 78u–4, 78u–5). Congress intended through the PSLRA to address the perceived need to deter meritless private securities lawsuits, "including 'the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer,' and 'the abuse of the discovery process to impose costs so burdensome that it is often economical for the victimized party to settle.' " *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000) (quoting H.R.Rep. No. 104–369, at 31 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 730). In particular, two provisions of the PSLRA impose stringent procedural requirements on plaintiffs pursuing private securities fraud actions. First, the PSLRA requires that:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

15 U.S.C. § 78u–4(b)(2) (1997) (emphasis added). Second, it requires that:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant -
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and *if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.*

15 U.S.C. § 78u–4(b)(1) (1997) (emphasis added).

Based on a review of the text and legislative history of the PSLRA and the fact that the Second Circuit pre-PSLRA pleading standard for scienter was the strictest in the nation, the Second Circuit has held that "the PSLRA effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher (with the exception of the 'with particularity' requirement)." *Novak,* 216 F.3d at 307–11 (quotation at 10).[1] The Second Circuit has summarized the pleading standard for scienter established in this circuit

---

1. The Second Circuit reiterated its conclusion that the PSLRA effectively adopted the Second Circuit pleading standard for securities fraud in *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 169–70 (2d Cir.2000), citing extensively to legislative history.

prior to the adoption of the PSLRA as follows:

> [P]laintiffs must allege facts that give rise to a strong inference of fraudulent intent. "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."

*Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (quoting *Shields,* 25 F.3d at 1128) (internal citations omitted). "Although speculation and conclusory allegations will not suffice, neither do we require great specificity provided the plaintiff alleges enough facts to support a strong inference of fraudulent intent." *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 169 (2d Cir.2000).

This standard was reaffirmed recently in *Kalnit v. Eichler,* 264 F.3d 131 (2d Cir. 2001), where the Second Circuit laid out the methodology to be followed in evaluating a securities fraud complaint. The court must analyze the complaint "under both methods of establishing scienter[ ]", i.e., (a) motive and opportunity, and (b) conscious misbehavior or recklessness. *Kalnit,* at 138–139. Each allegation made by the plaintiff must be considered in light of whether, and if so, how, it supports a strong inference of fraudulent intent under one of these two theories, and "the Complaint need only plead scienter by alleging *either* motive and opportunity, *or* conscious or reckless misbehavior . . .". *Ganino,* 228 F.3d at 170 (emphasis added).

In the *Novak* decision, the Second Circuit reviewed its prior case law, which provides guidance as to what kinds of allegations may or may not meet the "strong inference" standard. *Id.* at 311. The court identified cases in which plaintiffs had satisfied the strong inference standard, as well as cases in which the plaintiffs had failed to do so. The court noted that, as to the "motive and opportunity" approach, "the inference may arise where the complaint sufficiently alleges that the defendants . . . benefitted in a concrete and personal way from the purported fraud . . .". *Id.* at 311. The court also took note of precedent holding that a plaintiff could not establish motive and opportunity

> based on motives possessed by virtually all corporate insiders, including: (1) the desire to maintain a high corporate credit rating, or otherwise sustain the appearance of corporate profitability, or of the success of an investment; and (2) the desire to maintain a high stock price in order to increase executive compensation.

*Id.* at 307. Plaintiffs are instead required to allege that the defendants benefitted in a "concrete and personal way" from the alleged fraud. This requirement could be met in most cases by showing the defendants' "desire to profit from extensive insider sales." *Id.* at 308.

As to the "conscious misbehavior or recklessness" approach, the court identified several ways in which a plaintiff could satisfy the pleading standard. For instance, a plaintiff may sufficiently plead "conscious misbehavior" by alleging that the defendants engaged in "deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." *Id.* at 308.

A plaintiff may sufficiently plead recklessness in this context by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements." *Id.* at 308. Also, under certain circumstances it may be sufficient for a plaintiff to "allege[ ] facts dem-

onstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." Id. at 308. For instance, "the pleading standard was met where the defendant allegedly included false statements in SEC filings despite the obviously evasive and suspicious statements made to him by the corporate officials upon whom he was relying for this information and despite outside counsel's recommendation that these statements not be included." Id. at 309 (internal quotation marks and citations omitted). However, the court noted that liability based upon reckless conduct is limited in several important ways.

> [First,] allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud. Second, as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects.... Third, there are limits to the scope of liability for failure to adequately monitor the allegedly fraudulent behavior of others.... Finally, allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.

Id. at 308–09.

## III. *Discussion*

The defendants attack the plaintiffs' complaint on two grounds. First, the defendants contend that the plaintiffs have failed to state a claim upon which relief may be granted under Section 10(b) of the Exchange Act, and that the complaint should therefore be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Second, the defendants contend that the plaintiffs have failed to satisfy the height-ened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the PSLRA.

## A. Plaintiffs Have Alleged Facts Sufficient to State a Claim Under §§ 10(b) and 20(a)

### i. Section 10(b)

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, prohibit fraudulent activities in connection with securities transactions. Section 10(b) makes it unlawful:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1997). Rule 10b–5 specifies the following actions as being among the types of behavior proscribed by the statute:

> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ...

17 C.F.R. § 240.10b–5. The Second Circuit has held that

> [i]n order to state a cause of action under section 10(b) and Rule 10b–5, 'a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff's] injury.'

*Chill v. General Elec. Co.*, 101 F.3d 263, 266 (2d Cir.1996) (quoting *Acito,* 47 F.3d at 52).

"At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino,* 228 F.3d at 161. In connection with a claim of a material omission, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting and adopting the standard in *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

The defendants make six arguments in support of their contention that the plaintiffs fail to state a claim under Section 10(b) and Rule 10b–5.

First, the defendants argue that Xerox had no duty to disclose mundane operational difficulties inherent in the restructuring of a company the size of Xerox. They note that a company has "no duty to disclose all marginally-related material information any time it [chooses] to issue a comment." *In re Nokia Corp. Sec. Litig.,* No. 96CV3752(DC), 1998 WL 898334 at *5 (S.D.N.Y. Dec. 22, 1998) (internal quotation marks and citations omitted). However, it is sufficient if the plaintiffs plead that the alleged omissions were material in the sense that a reasonable investor might have considered them important in making a decision. *See Burke v. Jacoby,* 981 F.2d 1372, 1379 (2d Cir.1992).

Materiality is a mixed question of law and fact, e.g., [*TSC Indus., Inc.,* 426 U.S. at 450, 96 S.Ct. 2126], and a complaint may not properly be dismissed pursuant to Rule 12(b)(6) (or even pursuant to Rule 56) on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.

*Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). Here the plaintiffs have alleged that "[d]uring the Class Period, defendants, while informing investors about the cost savings from the restructuring and claiming its financial and operational benefits, failed to disclose the material negative impact that the restructuring had on the company's operations and revenue." Compl. ¶ 6. They have supported that allegation with particularized allegations concerning the reorganization and why it was not successful, and how the fact that it was not successful had a material negative impact on Xerox's operations, customers and sales. Thus the plaintiffs have done more than merely allege that there was a failure to disclose mundane operational difficulties or marginally-related material information. Moreover, the plaintiffs have alleged that not only did the defendants fail to disclose generally the material negative impact of the restructuring on Xerox all the while touting its benefits, but they also intentionally held back a substantial amount of information—i.e., concerning the breakdown of operations and the fact that the resulting customer dissatisfaction was leading to loss of revenue—that, if disclosed to investors, would have been viewed by them as contradicting the defendants' public statements. These are not allegations as to matters that are obviously unimportant to a reasonable investor. There is a "substantial likelihood that the disclosure of [this information] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."

*Basic,* 485 U.S. at 231–32, 108 S.Ct. 978 (internal quotation marks and citations omitted).

The defendants' additional arguments that Xerox had no duty to disclose omitted information, i.e., that accurate reporting of profit results does not create a duty to disclose operational problems or lost sales, that Xerox was not obligated to describe itself in disparaging terms, and that failure to meet internal estimates and sales quotas does not create a duty to disclose, are inapposite for the same reason. The plaintiffs have alleged more than the defendants argue is being alleged.

■ Second, the defendants argue that the plaintiffs make claims of corporate mismanagement, which are not actionable under the federal securities laws. The Supreme Court has held that Section 10(b) does not regulate transactions which are neither deceptive nor manipulative and which constitute no more than internal corporate mismanagement. *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 474–79, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Here, however, the plaintiffs have alleged more than internal corporate mismanagement. The gravamen of the plaintiffs' complaint is that the defendants failed to disclose, and made false and misleading statements concerning, the impact on the company of the internal corporate mismanagement, and these actions artificially inflated the price of Xerox common stock. Thus, the plaintiffs' claim is actionable under Section 10(b). *See Field v. Trump,* 850 F.2d 938, 948 (2d Cir.1988) (distinguishing between non-actionable fiduciary duty state law claims and actionable conduct that is misleading about corporate mismanagement); *Goldberg v. Meridor,* 567 F.2d 209, 220–21 (2d Cir.1977) (same).

■ Third, the defendants argue that fraud by hindsight is not actionable under Section 10(b). *See, e.g., Stevelman v.* *Alias Research Inc.,* 174 F.3d 79, 85 (2d Cir.1999) (finding that the plaintiff's allegations regarding certain "overly optimistic disclosures, by themselves, appear[ed] to amount to allegations of 'fraud by hindsight', which this Court has rejected as a basis for a securities fraud complaint.") This argument fails to properly characterize the plaintiffs' complaint, which alleges that the individual defendants made fraudulent statements simultaneously with and in order to cover up the problems caused by the restructuring. The plaintiffs have alleged that the individual defendants had detailed knowledge of problems resulting from the restructuring and that Xerox was losing sales as a result of those problems, and that, having such knowledge, they made false and misleading statements concerning the company to mislead investors.

■ Fourth, the defendants argue that the defendants' expressions of optimism are "non-actionable puffing". *See, e.g., Lasker v. New York State Elec. & Gas Corp.,* 85 F.3d 55, 59 (2d Cir.1996) (statements by a company that its "business strategies [would] lead to continued prosperity" were "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable"). However, the plaintiffs' allegations go beyond claims of mere puffery. The plaintiffs allege that the defendants made specific statements, including but not limited to those characterized by the defendants as merely reflecting optimism, knowing they were contrary to the company's actual situation.

■ Fifth, the defendants argue that the defendants' forward-looking statements are protected by the PSLRA's "safe harbor" provision and by the "bespeaks caution" doctrine. The "safe harbor" provision provides, in pertinent part, that with

respect to claims based on a false statement or misleading omission, persons shall not be liable:

> with respect to any forward-looking statement, whether written or oral, if and to the extent that -
>
>> (A) the forward-looking statement is -
>>
>>> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>>>
>>> (ii) immaterial; or
>>
>> (B) the plaintiff fails to prove that the forward-looking statement -
>>
>>> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
>>>
>>> (ii) if made by a business entity[,] was-
>>>
>>> (I) made by or with the approval of an executive officer of that entity; and
>>>
>>> (II) made or approved by such officer with actual knowledge by that officer that he statement was false or misleading.

15 U.S.C. § 78u–5(c)(1) (1997). Similarly, the "bespeaks caution" doctrine states that liability may not be imposed based on statements that, considered in their entirety, clearly "bespeak caution," rather than encourage optimism. *See, e.g., I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762–63 (2d Cir.1991). Here, the plaintiffs have pled facts that support a claim that is not precluded by either the PSLRA's "safe harbor" provision or the "bespeaks caution" doctrine, namely, that the defendants knew that their forward-looking statements were false and made them with the intent to mislead investors.

■ Sixth, the defendants argue that the content of analysts' and reporters' statements cannot be attributed to the defendants. However, the plaintiffs allege that the defendants made fraudulent statements and omissions in order to mislead the investing public, and that they purposefully conveyed the misinformation, in part, by transmitting fraudulent information to analysts and reporters. Rule 10b–5 makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ...." 17 C.F.R. § 240.10b–5. It does *not* require that such statements be made directly to the person a defendant intends to defraud.

### ii. Section 20(a)

■ The complaint also alleges that the defendants violated § 20(a) of the Exchange Act. Section 20(a) reads, in relevant part, as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a) (West 2000).

The defendants argue that this claim should be dismissed because it is derivative of the § 10(b) claim, which the defendants contend fails to state a claim. Because the court has found that the plaintiffs have stated a claim pursuant to

§ 10(b), this argument fails. The defendants also argue that this claim should be dismissed because the complaint fails to plead facts sufficient to give rise to an inference that the individual defendants, Allaire, Thoman, and Romeril, were "control persons" as defined by the SEC.

The SEC defines a "control person" for the purposes of § 20(a) as any person who possesses "direct or indirect . . . power to direct or cause the direction of management and policies of a person, whether through the ownership of voting securities or otherwise." 17 C.F.R. § 240.12b–2. The complaint alleges that Allaire, Thoman, and Romeril each "by virtue of their high-level positions with the Company, directly participated in the day-to-day management of the Company, was directly involved in the daily operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company . . ." Compl. ¶ 16. The complaint further alleges that

> [t]he Individual Defendants, because of their positions of control and authority as officers and directors of the Company, were able to, and did, control the contents of the various quarterly and annual financial reports, press releases and other public statements pertaining to the Company. Each Individual Defendant was provided with copies of the financial statements and documents alleged herein to be false and misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected.

Compl. ¶ 19. The complaint also alleges that each of the individual defendants was "a direct participant in a fraudulent scheme and course of business that operated as a fraud or deceit on Xerox common stock purchasers . . .". Compl. ¶ 20.

· The defendants describe these as "general conclusory allegations". However, the court in *In re Fine Host Corp. Sec. Litig.*, 25 F.Supp.2d 61 (D.Conn.1998) found that similar allegations were sufficient to state a claim under § 20(a).

> Plaintiffs have alleged more than mere status in their complaint. . . . [F]or example, plaintiffs allege that "by virtue of their high level positions, their responsibility for financial reporting and their intimate knowledge of the Company's financial condition and business practices, [the individual defendants] had the power to, and did, directly influence and control the decision-making and financial reporting of [the company]." Such an allegation goes beyond mere status and is plainly sufficient to defeat a motion to dismiss on that ground.

*Id.* at 73. The court went on to note that even if, as some courts have found, it is necessary for the plaintiffs to allege that the individual defendants in a § 20(a) action "engaged in culpable conduct or acted with scienter", that standard had been met by the plaintiffs in pleading the scienter required for the underlying violation of the Securities Exchange Act. *Id.* at 72.

The allegations in the complaint in this case are similar to those in *Fine Host Corp.*, and are, likewise, sufficient to survive a motion to dismiss. The allegations of scienter pleaded in connection with the § 10(b) claim, particularly as they concern the individual defendants' motive and opportunity to mislead investors, further support the plaintiffs' claim that the individual defendants had actual control over the "primary violator", Xerox, or that they aided Xerox "in performing some culpable conduct", *Sloane Overseas Fund Ltd. v. Sapiens Int'l Corp.*, 941 F.Supp. 1369, 1378 (S.D.N.Y.1996), and should therefore be individually liable as "controlling persons" under § 20(a).

**B. Plaintiffs Have Alleged Facts Which Satisfy the Heightened Pleading Standard of Rule 9(b) and the PSLRA**

 The plaintiffs have met the heightened pleading requirement for allegations of fraud, set forth in Federal Rule of Civil Procedure 9(b). The complaint identifies numerous statements by the defendants which the plaintiffs allege were fraudulent. The allegations of fraud "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields*, 25 F.3d at 1127–28. The particularized allegations of fraud in the complaint include the following:

- The complaint alleges that on April 7, 1998, Xerox and defendant Allaire stated in a press release that Xerox would consolidate four regional customer administrative centers in the United States into three, when in reality as many as 36 regional centers were consolidated into only three. Compl. ¶¶ 29–31. The plaintiffs allege that this misrepresentation concealed the magnitude of the restructuring from investors. Compl. ¶ 31.

- The complaint alleges that senior management of Xerox, including the individual defendants, made and disseminated to the investing public sales projections based upon quotas which they had been informed by Xerox's sales force were not achievable. Compl. ¶¶ 45–46. The complaint alleges that this was the result of "a desperate effort by management to meet the expectations that they had inculcated in investors." Compl. ¶ 45.

- The complaint alleges that on January 6, 1999, Xerox announced that it had reorganized the company's sales force

from a geographical orientation to a vertical industry-based organizational approach, Compl. ¶ 49; the complaint further alleges that members of Xerox "senior management made public statements about the sales force realignment". Compl. ¶ 51. However, the company was not actually reorganized in this manner until nine to twelve months after this announcement. Compl. ¶ 50. The complaint alleges that the defendants used the announcement about the sales force reorganization "to convince investors that they were facing challenges and responding to market forces and competition." Compl. ¶ 50.

- The complaint alleges that the defendants made public statements on October 22, 1998 and November 10, 1998 indicating that the restructuring was a success, that overhead costs were being significantly reduced, and that the restructuring would eventually result in pre-tax annual savings of approximately $1 billion. Compl. ¶¶ 53–56. The defendants allegedly made these statements even though they were aware at the time that any cost savings achieved by cutting vital personnel were more than offset by the effect of these cuts in terms of leaving the company unable to function efficiently, by the fact that Xerox was losing sales and customer relationships because of customer service and administration problems, and by the fact that the restructuring was a failure. Compl. ¶ 58.

- The complaint alleges that Xerox announced at a May 14, 1999 meeting with investors intended to allay concerns created by poorer than expected first quarter performance that "it had fixed most of its salesforce realignment problems and that the company

was, therefore, on course to deliver results in line with expectations." Compl. ¶ 73. The defendants made this statement in spite of the fact that they were aware at the time that the cause for the poor first quarter results was not the reorganization of the sales force, which had not even been implemented in major areas of the company, but the restructuring. Compl. ¶ 71. The defendants were also aware at that time that the company was experiencing serious customer service and operating problems as a result of the restructuring that were resulting in lost sales and revenue. Compl. ¶ 71. These allegations, among others, are sufficient to meet the requirement that allegations of fraud be pled with particularity.

■ The plaintiffs have also alleged facts that, taken together, give rise to a strong inference of the defendants' fraudulent intent, as required to state a claim under Section 10(b), under both the "motive and opportunity" and the "conscious misbehavior or recklessness" approaches. As to motive and opportunity,[2] the plaintiffs have alleged that the defendants knew, by the beginning of 1999, that the restructuring had had a material negative impact on Xerox's operations, customers and sales, and that they nonetheless continued to make statements to the investing public giving it a far different picture of the impact of the restructuring. The plaintiffs allege that, in addition, Xerox announced, on January 6, 1999, that it had reorganized into four operating groups, the largest of which was to include most of its direct sales force, when "[i]n reality, throughout most of the country, Xerox did not begin its sales force reorganization until after the Class Period ...". Compl.

¶ 50. These statements, the plaintiffs allege, caused the price of Xerox stock to become artificially inflated. Shortly after the misleading statements, the individual defendants sold approximately $31.4 million of their stock in Xerox. "Insider sales of stock may be evidence of scienter if the trades are unusual or suspicious in timing or amount." *Acito*, 47 F.3d at 54. The plaintiffs have alleged sufficiently that these trades are unusual and suspicious in both timing and amount. As to timing, the plaintiffs have alleged that the sales took place shortly after false or misleading statements that had caused the price of Xerox stock to rise. The plaintiffs have alleged sales proceeds that appear to be substantial in amount; the proceeds from the sales by the individual defendants totaled nearly $31.4 million. Also, the plaintiffs have alleged facts showing that this total amount was more than twice the aggregate of the collective annual compensation for the individual defendants for the years 1998 and 1999 combined. *See* Compl. ¶ 15. Further, the complaint alleges that there was an unusual concentration in terms of the volume of insider sales for any one month when compared with such monthly volume for the preceding three years. Therefore, the plaintiffs have sufficiently pled scienter under the "motive and opportunity" approach.

■ The plaintiffs have also sufficiently pled scienter under the "conscious misbehavior or recklessness" approach. The complaint alleges that the individual defendants had knowledge of facts or access to information contradicting their public statements, including information indicating serious problems related to the restructuring and the resulting customer dissatisfaction. The complaint alleges that

2. The defendants do not challenge the "opportunity" prong of this approach; the court therefore addresses only the "motive" issue.

the individual defendants participated in the drafting, preparation and/or approval of the various public and stockholder and investor reports and other announcements that are alleged to have been false or misleading. The complaint also alleges that the individual defendants each personally made statements extolling the benefits of the restructuring and its positive effect on the company, even though they were each aware that the restructuring was a failure and Xerox was suffering serious setbacks. *See* Compl. ¶¶ 54, 55, 60, 69, 77 (statements by Romeril), Compl. ¶ 59 (statement by Thoman), Compl. ¶¶ 30, 59, 65 (statements by Allaire). In combination with the foregoing allegations, the plaintiffs allege that members of the company's sales force personally communicated to the individual defendants that they were having substantial difficulties performing the new duties imposed upon them as a result of the restructuring, and that the sales quotas, upon which the sales projections were based, were unrealistic. Compl. ¶¶ 66, 97. The problems Xerox was having, the plaintiffs allege, affected the company's "core operations" and jeopardized the success of the company's most significant initiative at that time. Thus, the defendants were aware of those problems by virtue of their responsibilities within the company, and must either intentionally or recklessly have failed to report the company's true condition to the investing public. Further, the complaint alleges that the defendants represented in SEC disclosures that it was Xerox's practice to "regularly survey customers on their satisfaction, measure the results, analyze the root causes of dissatisfaction, and take steps and correct any problems." Compl. ¶¶ 38, 61, 98. These allegations are sufficient to meet the requirements for pleading scienter under the "conscious misbehavior or recklessness" approach.

Finally, the defendants argue that the complaint fails to meet the pleading requirements of the PSLRA and Rule 9(b) because the plaintiffs rely on "anonymous sources and unidentified internal reports". However, the Second Circuit has specifically stated that there is "no requirement in existing law that, in the ordinary course, complaints in securities fraud cases must name confidential sources ...". *Novak,* 216 F.3d at 314. "In fact, the applicable provision of the law as ultimately enacted requires plaintiffs to plead only facts and makes no mention of the sources of these facts." *Id.* at 313. *See* 15 U.S.C. § 78u–4(b)(1) ("[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.") This argument therefore fails.

## IV. *Conclusion*

For the reasons set forth above, the Defendants' Motion to Dismiss Plaintiffs' Amended Consolidated Complaint [Doc. # 43] is hereby DENIED.

It is so ordered.