Larry FREUDENBERG, Individual-
ly and on Behalf of All Others
Similarly Situated, Plaintiff,

v.

E*TRADE FINANCIAL CORPORA-
TION, Mitchell H. Caplan, Robert J.
Simmons and Dennis E. Webb, Defen-
dants.

No. 07 Civ. 8538.

United States District Court,
S.D. New York.

May 11, 2010.

Brower Piven, by: David A.P. Brower, Esq., Levi & Korsinsky, LLP, by: Eduard Korsinsky, Esq., New York, NY, for Plaintiff.

Davis Polk & Wardwell LLP, by: Amelia T.R. Starr, Esq., New York, NY, for Defendants.

*OPINION*

SWEET, District Judge.

Defendants E*TRADE Financial Corporation ("E*TRADE" or the "Company"), CEO Mitchell H. Caplan ("Caplan"), CFO Robert J. Simmons ("Simmons") and Capital Markets Division ("EGAM") President

Dennis E. Webb ("Webb") (collectively, the "Individual Defendants") have moved to dismiss the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint")[1] pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 995 (the "PSLRA"), 15 U.S.C. §§ 78u–4 *et seq.* Based upon the conclusions set forth below, the motion is denied.

By the Fall of 2007, the collapse of the subprime mortgage and the housing markets and the decline in the housing market were widely recognized. At the close of the third quarter in October 2007, many of the world's largest financial institutions announced their first in a wave of crippling write-downs of mortgage-related assets, including $11 billion by Citigroup, $10 billion by UBS and $8 billion by Merrill Lynch. UBS Posts Fresh $10bn Write-Down, BBC News, Dec. 10, 2007; Remarks of Senator Barack Obama: Our Common Stake in America's Prosperity (Sept. 17, 2007), available at http://www.barackobama.com/2007/09/17/remarksof senatorbarackobam24.php (indicating the connection between corporation's risky investments in the subprime mortgage market and the financial crisis). Class actions alleging securities act violations have followed particularly in this district, of which this case is one. See, also, *Kreysar et al. v. Syron et al,* No. 09–CV–832 (MGC); *In Re The Bear Stearns Companies, Inc. Sec. Litig.,* No. 08–CV–2793 (RWS); *In Re Lehman Bros. Holdings, Inc.,* No. 08–CV–8869 (DLC); *In Re Fannie Mae Sec. Litig.,* No. 08–CV–7831 (PAC); *In Re Moody's Corp. Sec. Litig.,* No. 07–CV–08375 (GBD); *In Re Morgan Stanley ERISA Litig.,* No. 07–CV–11285 (DAB).

---

**1.** Paragraph references (¶) are those set forth in the Complaint.

Defendants, including the Defendants in this action, urge that the losses incurred were the result of a "worldwide economic catastrophe" (Def's Memo in Support of Mot. to Dismiss ("MTD") at 1) and that the complaints set forth a case of fraud by hindsight rather than the violation of the securities laws.

Because the issue in this action is what the Defendants knew and when they knew it, a securities violation has been adequately alleged.

## I. *PRIOR PROCEEDINGS*

A class action complaint was filed by Larry Freudenberg on October 2, 2007, alleging violations of the securities laws by the Defendants. Additional related complaints were thereafter filed. An order consolidating the actions and appointing lead plaintiff and counsel was filed on July 17, 2008. The consolidated amended class action complaint (the "Complaint") was filed on January 20, 2009.

The instant motion to dismiss the Complaint was heard on September 9, 2009.

## II. THE COMPLAINT

According to the Complaint, the Defendants misrepresented the operation of E*TRADE's most important business sector, EGAM, and the Company's financial condition throughout the Class Period and thereby violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5.

E*TRADE was originally an Internet discount brokerage firm. ¶¶ 42, 62. Discount brokerage yields steady and safe returns, but opportunities for growth are limited. By the beginning of the Class Period, EGAM had aggressively expanded into the highly profitable mortgage business. ¶¶ 66–67. Although Defendants represented that E*TRADE's mortgage business focused on "organic" loans, originating its own mortgages for its "mass affluent" brokerage customers, EGAM was actually purchasing large mortgage pool from other originators. ¶¶ 6, 62–66, 72, 101–18. As a result, internally, EGAM was recognized as E*TRADE's most profitable division. ¶¶ 12, 70. However, by the beginning of the Class Period, the era of safely purchasing such mortgages was at an end. Nevertheless, to continue its stream of income from its most profitable segment, Defendants acquired huge quantities of loans from the nation's worst subprime and below subprime mortgage originators ¶¶ 70–72, 74, and failed to publicly disclose that they had changed E*TRADE's business model from conservative investments in high quality loans to purchasing extremely high risk, facially low quality instruments. ¶¶ 17–18. Thus, throughout the Class Period, Defendants represented to the public that E*TRADE continued to follow conservative loan origination and acquisition practices, when, in fact, Defendants had consciously decided to secretly sacrifice safety for profits.

To mislead investors about the investment risk of E*TRADE, Defendants represented that the Company's business was generated organically from its traditional trading and banking services to E*TRADE customers, ¶¶ 65, 72, 131, 146–48, 160, 174–177, 182, that Defendants used discipline and conservatism in its risk management and monitoring of its loan portfolio, see ¶¶ 7, 10, 11, 13, 65, 68, 144–48, 160, 170, 174–77, 193, 225–29, and, to distinguish E*TRADE from the troubled lenders who were already experiencing severe problems, see, e.g., ¶¶ 209, 212, that E*TRADE's portfolio of mortgage loans was "superprime." ¶¶ 11, 170–73, 185, 202, 211.

In fact, unable to organically generate significant numbers of its own mortgages, ¶¶ 88–93, in disregard of E*TRADE's own stated underwriting practices, ¶¶ 74–83, at the direction of the Individual Defendants, who oversaw E*TRADE's investments and financial reporting, Defendants used cash generated from its retail businesses to purchase high-risk asset-backed securities and pools of mortgages("MBS" and "ABS"), ¶¶ 62–63, from problem-ridden originators, such as Countrywide, Opteum, GMAC, and National City. ¶¶ 18, 68, 78–79, 101–18, 209, 214, 225, 288. While publicly characterizing the loans in its portfolio as "superprime," these loans were subprime or below subprime and did not meet E*TRADE's claimed "extremely conservative" credit standards. *Id.* See also ¶¶ 12, 70. To facilitate the steady influx of these low quality loans, Defendants decimated E*TRADE's due diligence apparatus by firing most mortgage loan and credit review personnel, ¶¶ 13, 67–68, 300, and all but eliminated any pre- or post-purchase review of these loan pools. ¶¶ 69, 81.

The Individual Defendants were alleged to have been fully aware of E*TRADE's risks and adverse consequences of this strategy. Even E*TRADE's de minimis review during the Class Period of only 1% of its bulk mortgages purchases demonstrated the extreme poor quality of those loans. ¶¶ 11, 13, 17, 75–82, 170–73, 202, 211. Indeed, 40% to 50% of sampled loans had negative discrepancies, such as unreported bankruptcies and overstated appraisals. ¶¶ 17, 78, 91. When one Confidential Witness ("CW") asked why E*TRADE kept "bad" problem loans instead of returning the loans to their originators—as E*TRADE had the right to do for a grace period after the purchases—he was told by E*TRADE management that EGAM wanted to maintain its relationships with the loan originators because it was "getting great deals" on these loans. ¶ 78. De-

fendants knowingly retained bad loans to protect the steady flow of these lowcost (and low-quality) mortgages. *Id.*

By the beginning of the Class Period, Defendants spoke to new hires of their internal concerns with the excessive, unbalanced risks E*TRADE was taking. ¶¶ 14, 72. In December 2006, Caplan "confidentially" admitted to employees that the Company was experiencing losses and expected more losses in 2007, ¶¶ 16, 98, but Defendants made the opposite representations to the public. ¶¶ 174–77, 181–85. Contrary to Defendants' public statements regarding the impeccable AAA credit rating of the securities in E*TRADE's investment portfolio, see ¶¶ 20, 22, 224, 235, 244, 246, 254, 271–72, 279, 282, E*TRADE's overexposure to subprime mortgages was discussed among E*TRADE's senior management and led Caplan to internally voice hope that a "white knight" would rescue E*TRADE. ¶¶ 94–99. Defendants also knew that E*TRADE's mortgages were of very low quality because E*TRADE's attempts to resell purchased loan pools to other financial institutions failed because of the "terrible, low value," below subprime, quality of the loans and loan documentation. ¶¶ 17, 76, 86. Consequently, E*TRADE was forced to retain these knowingly impaired, low quality mortgages. See ¶ 81; see also ¶ 84.

To conceal the high risk nature and deterioration of E*TRADE's portfolio, ¶¶ 21, 122–23, 138–40, 154–56, 164–65, 220–22, 243, Defendants ignored Generally Accepted Accounting Principles ("GAAP") and SEC financial reporting and accounting rules, regulations and guidance, by, *inter alia,* failing to adequately reserve for loan losses, failing to timely record securities' impairments, and overvaluing E*TRADE's securities portfolio, thereby rendering E*TRADE's financial state-

ments to be materially inaccurate, reported net income and earnings to be materially overstated, and loss reserves to be materially understated. ¶¶ 21, 22, 333–37. Indeed, throughout the Class Period, as the mortgage crisis was reverberating across the country, E*TRADE actually reduced its reserve coverage ratio from 83% to just 33% as well as its reserve as a percentage of total loans from 0.20% to 0.19%, ¶¶ 220–22, thereby artificially reducing E*TRADE's allowance for losses when actual losses were increasing. *Id.*

On July 25, 2007, the Company partially disclosed that its provision for loan losses rose to $30 million in the quarter, double the level of the prior year. ¶ 310. In reaction, E*TRADE's shares suffered a one-day drop of 6.89%. *Id.* However, Defendants blunted this disclosure by reasserting the Company's "conservative approach" to credit and funds management. *Id.* On September 17, 2007, in another partial disclosure, E*TRADE announced that it was exiting the wholesale mortgage business, had revised its 2007 earnings guidance and set aside $245 million in the second half of the year to cover loan losses. ¶¶ 20, 312–13. In response, E*TRADE's stock price declined further, leaving the shares down by almost 50% from their 2007 high. However, Defendants held back the full truth and continued to falsely represent E*TRADE's "conservative" approach, "high FICOs, low LTVs [loan-to-value ratio] and high owner occupancy levels," "loan risk mitigation discipline," and "excess collateralization." *Id.*

On the last day of the Class Period, November 9, 2007, the magnitude of the undisclosed risks of E*TRADE's foray into mortgage investments was finally revealed: $450 million of exposure in its $3 billion ABS portfolio; a $204.8 million increase in loan loss provisions; write-downs in ABS of $185.5 million; expected additional significant write-downs in 4Q2007; an SEC informal inquiry into E*TRADE's loan and securities portfolio; and Webb's departure. ¶¶ 22–24, 279–87. Shortly thereafter, on November 29, 2007, Caplan was forced out as CEO. ¶¶ 29, 299. As a result of these disclosures, E*TRADE's stock suffered a one-day decline on the next trading day of 58.67%. ¶¶ 287, 314.

E*TRADE also experienced an $18 billion "run on the bank" by bread-and-butter brokerage customers, who closed their E*TRADE accounts because of their concerns about the Company's capitalization and continued viability, ¶¶ 24–25, 285–86, which threatened E*TRADE's continued existence. E*TRADE finished 2007 as that year's worst performing stock in the S & P 500 index, after it was forced to finally acknowledge astounding asset losses and impairments of $2.45 billion for the year ended December 31, 2007 and reported a net loss of $1.4 billion, or $3.40 per share, due primarily to losses in home equity loan and asset-backed securities portfolios. ¶ 25–27. Part of that impairment reflected E*TRADE's sale of its ABS portfolio (which had a cost basis of $3 billion) to Citadel Investment Group for the steeply discounted price of $800 million. ¶¶ 25, 293. This transaction also significantly increased E*TRADE's corporate debt to $3 billion (from $1.8 billion the previous year). ¶¶ 26, 293. While investors lost billions of dollars as a result of Defendants' misstatements regarding E*TRADE's business and overstatements of its assets, net income and profits, the Individual Defendants are alleged to have realized over $13 million from sales of their E*TRADE stock holdings, ¶¶ 28, 44–46, and millions more in incentive compensation for allegedly meeting performance goals. *Id.*

## III. THE 12(B)6 STANDARD

Motions to dismiss are generally viewed with disfavor. *Teachers' Ret. Sys. of LA v.*

*A.C.L.N., Ltd.,* No. 01–CV–11814, 2003 WL 21058090, at *10 (S.D.N.Y. May 12, 2003). "When considering a motion to dismiss, the complaint is liberally construed, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *In re Tommy Hilfiger Sec. Litig.,* No. 04–CV–7678, 2007 WL 5581705, at *2, 2007 U.S. Dist. LEXIS 55088, at *5 (S.D.N.Y. July 20, 2007) (internal quotation marks and citations omitted). A complaint need only allege "enough factual matter (taken as true)" to suggest that a violation occurred, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . ." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (emphasis added; citation omitted). The pleading need only contain "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level." *Id.* at 556, 127 S.Ct. 1955. As here, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1940–41, 173 L.Ed.2d 868 (2009).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 1949. For elements of claims subject to Rule 8(a), *Twombly* requires more than pleading the "bare elements of [the] cause of action," but far less than the particularity of pleading required under Fed.R.Civ.P. 9(b). See *id.* at 1954.

■ Under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. 240.10b–5(b), a plaintiff must plead six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrep-

resentation or omission and purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Heller v. Goldin Restructuring Fund, L.P.,* 590 F.Supp.2d 603, 613 (S.D.N.Y.2008) (citations omitted). The heightened pleading standard under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and *Tellabs v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), applies only to the element of scienter; all other elements of a § 10(b) claim are governed by traditional pleading standards under Fed.R.Civ.P. 8(a) or 9(b). See *In re PXRE Group, Ltd. Sec. Litig.,* 600 F.Supp.2d 510, 528–29 (S.D.N.Y.2009). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statement were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir. 2004) (internal citations and quotation marks omitted). A plaintiff is not required to plead evidence. See *Skydell v. Ares–Serono S.A.,* 892 F.Supp. 498, 501 (S.D.N.Y.1995).

## IV. THE COMPLAINT HAS ALLEGED MATERIAL MISSTATEMENTS AND OMISSIONS

■ Rule 10b–5(b) prohibits "mak[ing] any untrue statement of material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5. "[O]nce corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading." *In re Par Pharm., Inc. Sec.*

*Litig.*, 733 F.Supp. 668, 675 (S.D.N.Y. 1990). See also *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1098 n. 7, 111 S.Ct. 2749, 115 L.Ed.2d 929 (when a company chooses to speak, "there can be no question that the statement [it] do[es] make carrie[s] with it no option to deceive"); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F.Supp.2d 452, 469 (S.D.N.Y.2006) ("corporations have a duty to disclose all facts necessary to ensure the completeness and accuracy of their public statements"). If a company, like E*TRADE here (¶¶ 2, 128–278), "puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F.Supp.2d 388, 401 (S.D.N.Y.2005) (internal quotation marks and citation omitted) rejected the holding in *In re Citigroup, Inc. Sec. Litig.*, 330 F.Supp.2d 367 (S.D.N.Y.2004) that a company is not required to disclose adverse information regarding its sources of revenues. *Id.* at 378. See *Van der Moolen*, 405 F.Supp.2d at 400. A statement is misleading if a reasonable investor would have received a false impression from the statement. *Par Pharm.*, 733 F.Supp. at 677. Moreover:

> [S]tatements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead
> . . .

*McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir.1990). The purpose of the disclosure requirements is "to inform, not to challenge the reader's critical wits." *Va. Bankshares*, 501 U.S. at 1097, 111 S.Ct. 2749.

Regulation S–K, Item 303, required E*TRADE to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Furthermore, the SEC Division of Corporation Finance, on December 1, 2005, set forth accounting and disclosure requirements to address concerns regarding increased risky loan originations, as follows:

Disclosures about Residential Loan Products

- The types of residential mortgage loans held and the underwriting standards used to originate these loans are important to an understanding of a registrant's financial condition and results of operations ... detailed information about certain loan products may be needed in order to provide a complete picture of the portfolio's credit risk ...

- Describe the significant terms of each type of residential mortgage loan product offered, including underwriting standards used for each product, maximum loan-to-value ratios and how credit management monitors and analyzes key features, such as loan-to-value ratios and negative amortization, and changes from period to period.

- Disclose the approximate amount (or percentage) of loans originated during the period and loans as of the end of the reporting period that relate to each type of residential mortgage loan product.

- Disclose the approximate amount ... of off-balance sheet loans with retained credit risk which relate to each type of residential mortgage loan product ...

- Disclose the approximate amount (or percentage) of residential mortgage loans as of the end of the reporting period with loan-to-value ratios above 100% ...

- Describe risk mitigation transactions used to reduce credit risk exposure, such as insurance arrangements, credit default agreements or credit derivatives.

- Explain any limitations of your credit risk mitigation strategies ...

- Disclose trends related to residential mortgage loans with features that may result in higher credit risk that are reasonably likely to have a material favorable or unfavorable impact on net interest income after the provision for loan loss ...

Current Accounting and Disclosure Issues in the Division of Corporation Finance, Dec. 1, 2005, at 56–57, available at http://www.sec.gov/divisions/corpfin/acctdis 120105.pdf. SEC rules, regulations, and advisories confirm that Defendants omitted material information concerning E*TRADE's mortgage loans.[2]

■■■ A misrepresentation or omission is material when a reasonable investor would attach importance to it in making an investment decision. See *Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1090, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991); *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available"). The materiality requirement poses a very low burden; "a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2nd Cir.2000). Thus, the trier of fact usually decides the issue of materiality.[3]

■■■ Material facts include not only information disclosing financial results, "but also facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *Klein v. PDG Remediation*, 937 F.Supp. 323, 327 (S.D.N.Y.1996) (citation omitted). A material omission is actionable "[e]ven if, [Defendants] were not able to quantify the exact impact of the defect at the time of the filing [the Company's SEC report]." *Simon v. Am. Power Conversion Corp.*, 945 F.Supp. 416, 431 (D.R.I.1996). Furthermore, material misrepresentations include those "concern[ing] a segment or other portion of the registrant's business that has been identified *as* playing a significant role in the registrant's operations or profitability." SEC Staff Accounting Bulletin ("SAB") No. 99, 64 Fed.Reg. 45150, 45152 (1999) ("SAB 99"; Pl.'s Mem. In

2. The December 2005 SEC Guidance provides "persuasive guidance" for evaluating E*TRADE's omissions. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 163 (2nd Cir.2000). See also *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944) ("rulings, interpretations and opinions ... constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance").

3. See *Basic*, 485 U.S. at 240, 108 S.Ct. 978 (materiality is inherently an intensely "fact-specific inquiry" that "depends on the significance the reasonable investor would place on the withheld or misrepresented information"); *In re Warnaco Group Inc. Sec. Litig.*, 388 F.Supp.2d 307, 313 (S.D.N.Y.2005) (materiality "may be characterized as a mixed question of law and fact, and is generally inappropriate for determination at the pleading stage" (citation omitted)).

Opp'n, Ex D). SAB 99's "non-exhaustive list of factors ... [is] persuasive guidance for evaluating the materiality of an alleged misrepresentation." *Ganino*, 228 F.3d at 163 (citations omitted). As Defendants concede, "the largest assets (by a wide margin) on [E*TRADE's] quarterly balance sheets were [mortgage] loans and MBS." MTD at 18.

### a. *"Superprime" and Related Allegations of Misrepresentations And Omissions Were Actionable And Material*

The Defendants made repeated misrepresentations that E*TRADE's loans were "superprime," ¶¶ 170, 202, 211. Such statements misled investors regarding the nature of E*TRADE's loans and exposure to subprime and mortgage risk—i.e., the fundamental nature of its most important business segment. See, e.g., *In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F.Supp.2d 947, 978 (D.Minn.2009) ("concealment of specific information related to the Portfolio's subprime exposure and contents" may mislead investor); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F.Supp.2d 1132, 1146 (C.D.Cal.2008) (misleading definition of subprime made statements about "subprime" operations "inherently misleading to investors"). The Defendants' MTD also does not address Defendants' statements that E*TRADE was buying seasoned loans so it could see how the borrower was performing and was putting back problem loans, see, e.g., ¶ 214, which were false and misleading because Defendants deliberately refused to return bad loans to subprime lenders so that E*TRADE could continue to purchase high risk loans at low prices. ¶¶ 78, 81–82, 216(b).

Defendants are alleged to have misrepresented the quality of the borrowers and loans held on E*TRADE's balance sheet as "superprime" (i.e., even less risky than "prime"). ¶¶ 11, 170–73, 202, 211. Defendants also repeatedly understated E*TRADE's exposure to its subprime and other problem loans. See, e.g., ¶ 202 (Caplan's assurance that E*TRADE's exposure to "what the market is concerned about in either subprime or [Alt–A], one of them is less than one-fifth of 1% of the overall whole loan balances and the other one is less than 0.5%"); ¶ 212 (Caplan's statement: "within the '06 vintage, we have zero in subprime"). It is alleged that high-risk loans constituted substantial portions of E*TRADE's portfolio. ¶¶ 279–82, 288–90.

Moreover, Defendants supported the "superprime" designation by speaking of "conservative" and favorable LTVs, FICO scores and debt-to-income ratios (DTIs), and by professing that E*TRADE's holdings compared favorably to others in the industry. See, e.g., ¶¶ 144, 170 ("we really are risk averse. Our average FICO scores are very high, creating subprime and superprime basically on balance sheet, low LTVs of loan-to-values"), 172, 212. In December 2006, Caplan spoke to investors about "tak[ing] virtually no credit risk," and claimed: "Within mortgage loans, we focus exclusively on what you would define almost as superprime. So whether you look at average median or mode across the board, they are in the mid–700, 720, 730 range across all the products and services. LTVs are probably way below what are typically industry averages...." ¶ 172. See also ¶ 212 ("You see DTIs and LTVs that, again, are conservative and are probably significantly better than what you have seen in maybe the general risk industry at-large or in others"). Defendants also spoke of E*TRADE's "focus on loan to value," ¶ 168, and the "high" credit quality and "strict discipline with respect to credit quality" of its holdings. See, e.g., ¶¶ 185, 211.

However, the Complaint has alleged that E*TRADE's loan portfolio was far from "superprime," high quality or conservative and did not have the LTV/CLTV (current loan-to-value ratios), DTI, and FICO values claimed by Defendants. Many of E*TRADE's loans are alleged not to qualify even as "prime"—much less as "superprime." ¶¶ 2, 13, 17–18, 69–86, 102–18, 170–73, 240, 372. Many of E*TRADE's loans were reduced loans or no documentation loans ("liar loans"), which made them automatically subprime. ¶¶ 69, 79–80.11. Near the end of the Class Period, 50% of the loans in E*TRADE's First Lien Portfolio and 45% in the home equity line of credit ("HELOC") Portfolio did not verify borrowers' income, assets or both. In addition, an undisclosed portion of the remaining loans were "Alt–A" loans, which were not "superprime." ¶ 249. An E*TRADE due diligence analyst and underwriter estimated that 40% to 50% of E*TRADE's purchased loans had negative discrepancies in loan documentation (lower credit scores than reported, or unreported bankruptcies). ¶ 78. A former E*TRADE loan audit and acquisitions manager (CW4) reported seeing loan pools where every sampled loan was highly risky in terms of LTVs, DTIs and ARMs (adjustable-rate mortgages). ¶ 82. Nonetheless, when CW4 brought this up at meetings attended by Webb, CW4 was told not to review the rest of the high risk portfolios, and these portfolios remained with E*TRADE. ¶ 82. It is alleged that the loans E*TRADE's acquired had far lower scores than E*TRADE claimed, see, e.g., ¶ 112 (Fremont's August 2006 admission that its average FICO score was 624, and LTV was 81%-much lower than the credit standards claimed by Defendants). When E*TRADE tried to re-sell loan pools to other banks, the purchasing banks returned them because they were comprised of "terrible, low value" below subprime loans. ¶ 76. See also ¶ 344 (Webb and other senior executives refused to return problem loans to their originators despite being implored to do so by due diligence personnel); ¶ 372. According to the Complaint, Defendants knew exactly what types of loans were in E*TRADE's portfolios.

On July 26, 2007, the SEC requested additional disclosures regarding E*TRADE's loan underwriting policies, LTV and collateral requirements and policy charges. ¶ 217. On August 16, 2007, E*TRADE disclosed that 20% of loans in the First Lien Portfolio and approximately 26% of loans in the HELOC Portfolio had FICO scores below 700, and that using "traditional" LTV/CLTV ratios, only 48% of the HELOC portfolio had a CLTV of 80% or lower which the Defendants asserted was not an appropriate ratio. ¶¶ 227–28.

On November 15, 2007, six days after the Class Period, E*TRADE admitted, in response to an SEC inquiry, that its LTV/CLTV data was based on the time of loan origination, and was not updated to reflect property value changes and additional debt assumed by borrowers. ¶ 302. E*TRADE further belatedly admitted that it had merely "attempted" to exclude loans to borrowers with FICO scores under 640, CLTVs above 100% and DTIs below 50%, and acknowledged that some originators required E*TRADE to purchase entire pools without exclusion. ¶¶ 31, 300. Moreover, estimated figures (released the following year) revealed that current estimated LTV/CLTVs averaged 84.30% for 1–to–4 family mortgages and 93.70% for HELOCs. ¶ 304

"The Second Circuit has explicitly recognized that plaintiffs may rel[y] on postclass period [statements] to confirm what a defendant should have known during the class period." *Lapin v. Goldman Sachs Group, Inc.,* 506 F.Supp.2d 221, 237

(S.D.N.Y.2006) (internal quotation marks and citations omitted). See also *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F.Supp.2d 158, 181 (S.D.N.Y.2003) (post-class period articles can be used to establish awareness of falsity of class period statements; the opposite result would reward defendant for successful concealment).

Failure of the Defendants to disclose that LTV/CLTVs were based on over-stated appraisals and were not updated is alleged to be material and evidenced by Defendants' repeated public statements about LTV/CLTVs during the Class Period, ¶¶ 168, 170, 172, 185, 201, 212, 214, 224–28, 244, 248, 252, 254, 257, 272; the SEC's request to E*TRADE to provide information as to LTV/CLTVs and updates, ¶¶ 217, 261–262, 302; and E*TRADE's post-Class Period admission to the SEC that updating LTV/CLTV ratios "would provide useful information for both our internal credit risk management process as well as for our investors." ¶ 302.

Because Plaintiffs have alleged that Defendants made false statements with regards to the important segment of its business at issue in this suit which reasonable investors would have taken into account when making investment decision, they have sufficiently pled that those statements were misleading and material.

b. **Statements Regarding Organic Origination And Organic Growth Are Alleged To Be False And/Or Materially Misleading**

The Defendants are alleged to have repeatedly emphasized "organic" growth and origination to mislead investors into believing that the bulk of E*TRADE's business and loans were originated by E*TRADE. See, e.g., ¶ 131 ("we are seeing significant organic growth in cash, assets and credit"); ¶ 160 ("the percentage of origination versus purchase is up dramatically"). See also ¶¶ 65, 132, 146, 148, 174–77, 182, 185 (Simmons' statement: "We grew the balance sheet while adhering to our strict discipline with respect to credit quality ... particularly as we build out and expand our mortgage origination platform, which will focus on high-quality first-lien products to hold on the balance sheet").

■■■ According to the Complaint, organic loans were a minimal portion of E*TRADE's holdings. Near the beginning of the Class Period, only $2 billion (or 16.7%) out of $12 billion was generated organically, ¶ 72, and that percentage declined throughout the Class Period. Defendants are alleged to have misled investors to believe that loans purchased were as good as the high quality originated by stating, "whether purchased or originated," shareholders were "protected across the board with respect to underlying credit based on FICO and LTVs and DTIs," and that there was "no meaningful difference" between E*TRADE's originated and purchased mortgages. ¶ 10.

Defendants also are alleged to have lied to investors when asked directly about organic origination. On July 19, 2006, an analyst asked for the source for the growth in E*TRADE's "average home loans" and if "[i]t would be safe to say this was all organic [loan growth] from your existing customers?," Caplan's response gave investors the impression that E*TRADE'S percentage of organic loans was larger than the miniscule actual percentage: "[s]ome of it is organic. Some of it is purchase. But we have made a huge transformation ... and really pushed hard toward the growth of our balance sheet coming from our core retail customers." ¶ 148. See also ¶ 160 (analyst question: "in terms of the loan growth, the $2.5 billion, how much of that loan growth is purchased versus originated yourselves?" and Caplan's response: "[t]he percentage

of origination versus purchase is up dramatically and so it's improved hugely.") These statements are alleged to be misleading. See *Kaltman v. Key Energy Servs., Inc.,* 447 F.Supp.2d 648, 661–62 (W.D.Tex.2006) (company "is in an excellent financial position" and has ability to execute "plan for organic growth" are actionable); *Rosen v. Textron, Inc.,* 321 F.Supp.2d 308, 320 (D.R.I.2004) ("I see an even stronger organic growth story as we move forward because our businesses have gained a lot of momentum" was materially misleading); *Manavazian v. ATEC Group, Inc.,* 160 F.Supp.2d 468, 480–81 (E.D.N.Y. 2001) (statements that business scheme was "framework" for "organic growth" and "blueprint" for "hyper-growth"; and company was "poised for future growth" and occupied a "strategic position in the technology industry" were actionable). Shortly after the Class Period (after originated loans had supposedly increased, according to Defendants' statements), it is alleged that E\*TRADE revealed in response to an SEC request that only $3.7 billion, or less than 13%, of E\*TRADE's $29.3 billion in mortgage loans were self generated. ¶ 290.

Because Plaintiffs have pled that Defendants made statements about the origin of E\*TRADE's mortgage loans that misrepresented to investors the quality of those loans, they have sufficiently alleged that these statements were materially misleading.

c. *"Discipline" Misrepresentations Are Material and Actionable*

Defendants' statements about "discipline," are alleged to have fundamentally misstated the most significant aspect of E\*TRADE's most important business sector. Defendants' statements that "[w]e grew the balance sheet while adhering to our strict discipline with respect to credit quality," ¶ 185; "we have stayed completely disciplined about focusing on what we

call prime and really superprime borrowers," ¶ 202; and "[w]e also maintained strict discipline with respect to risk mitigation, all the way down to the level of the borrower," ¶ 211, are alleged to be false and misleading in light of, *inter alia,* facts that while Defendants increased purchases of risky loans, only 1% of purchased loans were reviewed, appraisals were overstated, experienced loan review personnel were terminated, remaining loan reviewers were too overworked and inexperienced to review more than a de minimis percentage of the purchased loans, CLTVs were not tracked, and Defendants refused to review or return loan pools when problematic loans were found from small samplings. ¶¶ 67–86, 187(d), 206(c), 216(f).

As the Supreme Court in *Va. Bankshares* stated:

> It is no answer to argue … that the quoted statement … did not express a reason in dollars and cents, but focused instead on the "indefinite and unverifiable" term, "high" value, [ ] like the similar claim that the merger's terms were "fair" … The objection ignores the fact that such conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading. Provable facts either furnish good reasons to make a conclusory commercial judgment, or they count against it, and expressions of such judgments can be uttered with knowledge of truth or falsity just like more definite statements ….

501 U.S. at 1093, 111 S.Ct. 2749.

█ Even if statements about "discipline," etc., might not be actionable in another context, it is claimed that the glaring disparity between E\*TRADE's operations and Defendants' statements makes the statements actionable here. See, e.g., *Countrywide,* 588 F.Supp.2d at 1144

("where a company's essential operations were so at odds with the company's public statements[,] ... many statements that would not be actionable in the vast majority of cases are rendered cognizable to the securities laws"). Unlike in *In re JP Morgan Chase Sec. Litig.*, 363 F.Supp.2d 595 (S.D.N.Y.2005), cited by Defendants, Defendants' statements here were not mere "generalizations regarding ... fiscal discipline." *Id.* at 633. Instead, Defendants specifically spoke of discipline with respect to particular items and borrowers. See, e.g., ¶ 202 ("we have stayed completely disciplined about focusing on what we call prime and really superprime borrowers"). "[P]laintiffs offer [defendant]'s statements that it observed standards of high-quality credit and underwriting, and set those statements against detailed allegations of practices that utterly failed to meet those standards." *In re New Century*, 588 F.Supp.2d 1206, 1226 (C.D.Cal.2008). See also *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir.1992) (representing that "lending practices are 'conservative'" and "collateralization is 'adequate'" is actionable if "omit[ting] certain facts contradicting these representations").

Because the statements Plaintiffs allege were misleading related to the fundamental nature of E\*TRADE's most important business sector and are belied by detailed allegations directly contradicting the assertions of "discipline" with regard to investment in prime and superprime loans, these statements are actionable and material.

### d. *Material Information Regarding, Inter Alia, Risks, Underwriting Practices and Originator Identity Was Omitted*

"[A]s a mortgage lender ... underwriting practices would be among the most important information looked to by investors." *Countrywide*, 588 F.Supp.2d at 1185 (citation omitted). Here, Defendants' disclosure that "net interest income has become our leading category of revenue," ¶ 136, that loans and MBS were the largest assets, and that E\*TRADE anticipated increasing its mortgage portfolios, ¶ 137, without investors that E\*TRADE's "leading category of revenue" was largely comprised of high-risk loans, purchased from barrel-scraping subprime lenders with no, or virtually no, due diligence, without tracking current CLTVs. ¶¶ 282, 298–90, 296, 302.

The SEC's October 12, 2007 letter stated that E\*TRADE's SEC filings did not provide ample information on E\*TRADE's significant products (especially lending products), and requested additional disclosures "to provide greater transparency surrounding the risks related to [E\*TRADE's] lending activities (particularly credit risk)," and sought information on charge offs, underwriting policies, and loan originators. ¶¶ 261–65.

Moreover, Defendants' failed to disclose the identities of E\*TRADE's loan originators, see ¶¶ 10, 18, 78, 101–18, 160, 170–73, 185, 195, 209, 214, 225, 240, 288–91, 300, and amounts they originated. They are alleged to have concealed from investors that the bulk of E\*TRADE's loans were purchased from troubled subprime lenders such as National City, GMAC, Countrywide, Opteum, Inc. and Fremont General—who had become notorious for poor underwriting standards, illegal practices, government investigations, delinquencies, and the mortgage crisis. ¶¶ 18, 78, 101–118, 209, 214, 225, 288. Plaintiffs have not conceded that E\*TRADE disclosed the identity of 74% of its originators in August 2007, as set forth in MTD at 19 n. 15 (citing ¶¶ 224–29). According to the Plaintiffs, Defendants' August 16, 2007 Supplemental Disclosure listed E\*TRADE as among the originators of 74% of its loans

and did not "stat[e] the amounts involved." ¶ 225. By including E*TRADE in the list, Defendants made it impossible to determine the proportion of loans purchased from other firms. The identity of E*TRADE's originators was not made available until late in the Class Period, when investors and the SEC demanded more information. See ¶¶ 214, 217, 261–63 (SEC request for amount purchased from each originator). On July 25, 2007, Caplan merely mentioned "Nat City and [unidentified] others" as originators in response to an analyst inquiry—while at the same time reassuring investors that E*TRADE was itself originating and keeping more self-originated loans on its balance sheet in each quarter. ¶ 214. A partial disclosure on August 16, 2007 only listed some of the originators and omitted the amounts purchased from them. ¶¶ 103, 225. E*TRADE's partial disclosure on September 17, 2007 only listed the same limited information as in August. 1247. According to the Plaintiffs, a full list with amounts was not made public until November 15, 2007 (six days after the Class Period ended), in response to an SEC inquiry. ¶ 288.

From early in the Class Period, National City (which alone originated close to half of E*TRADE's loans) was repeatedly accused by the government of falsifying documents and had to take huge write-downs. ¶¶ 18, 106–11. Fremont's substandard lending practices were the subject of an FDIC "cease and desist" order during the Class Period. ¶¶ 112–14. Countrywide (which originated or serviced 8.34% of E*TRADE's mortgage portfolio) had reported significant non-prime as well as skyrocketing subprime delinquencies from early in the Class Period. ¶¶ 105, 209. CW2, a former E*TRADE senior executive reported that Webb purchased "very high risk" loans from National City and Countrywide; at least 50% were actually subprime. ¶ 75. The importance of such

information is also evidenced by: the SEC's demands for this information, ¶¶ 217–19, 261–65; Defendants' attempts to conceal this information by misleadingly claiming that E*TRADE's loans were "superprime," ¶¶ 31, 170, 202, 211, by avoiding questions on origination amounts, ¶ 214; and analysts' requests for the information. ¶ 214 (questions about how much of mortgage portfolio was originated versus purchased, and how Defendants assured purchased loans' quality).

It is the position of the Plaintiffs that these omissions were material and that the omitted information was important to investors.

According to the Plaintiffs, the Defendants repeatedly represented to investors that E*TRADE's mortgage assets were of high credit quality, consistently monitored in a disciplined, focused fashion. See, e.g., ¶¶ 3, 211 (Caplan's claim that E*TRADE was maintaining "strict discipline" with "respect to risk mitigation, all the way down to the level of the borrower"). These statements are alleged to be materially false in view of E*TRADE's allegedly virtually non-existent due diligence when purchasing high-risk mortgage loans from infamous originators. ¶¶ 13, 30–31, 120, 65–86, 300, 344. Severe undisclosed problems with purported due diligence included: massive cutting of loan and credit review personnel, ¶¶ 13, 65–86, 300, 344; eliminating pre-purchase due diligence, ¶¶ 69, 81; reviewing (post purchase) only a 1% sample of purchased loans with insufficient review time, ¶¶ 13, 30, 75, 81, 82, 300–01; reviewing only samples for compliance with the originator's "minimum" criteria, ¶ 30; purchasing Countrywide loans without mortgage files or guidelines, ¶ 75; purchasing entire loan pools from which E*TRADE was prohibited from excluding problem loans, ¶ 31; merely "attempting" to exclude loans with poor FICO, CLTV

and DTIs and looking at scores at the time of origination, rather than at the time of purchase, ¶ 31; and failing to conduct further review of loans where the 1% due diligence sample indicated severe problems with the loan documents and underwriting. ¶¶ 13, 78–82.

The loan pools purchased by E*TRADE were so poor that even inadequate due diligence efforts revealed significant numbers of problem and high-risk loans which when reported to Defendants or other senior management, were ignored and the purchase of more high risk loans from the same sources were directed. A former E*TRADE due diligence analyst and senior underwriter, CW6, reported that 40–50% of E*TRADE's purchased loans had negative loan documentation discrepancies (i.e., unreported bankruptcies or lower credit scores than reported), but despite the fact that these discrepancies were reported to management, Defendants refused to return most of these loans, which they had a right to do. When CW6 asked why, E*TRADE's managers said that E*TRADE kept bad loans to maintain relationships with loan originators, which were giving E*TRADE "great deals" on these loans. ¶ 78. Webb also purchased portfolios even though risk metrics programs results showed that the portfolios were riskier than permissible levels. ¶ 71.

In light of the allegations of E*TRADE's deficient due diligence practices in conjunction with Defendants' representations to investors that the Company invested in and closely monitored its high quality mortgage assets, Plaintiffs have sufficiently pled that Defendants omitted material information with regard to risk.

### e. Loan Loss Reserves Were Materially Misrepresented

■ Defendants represented that the loan loss allowance was based on careful monitoring of the quality of the portfolio and other relevant conditions, and misleadingly represented that loan loss allowances should be equal to at least 12 months of probable projected loan losses. See ¶¶ 155, 164–65. See also ¶¶ 21, 25, 220–22. However, it is alleged that Defendants left the loan loss allowance at 0.20% of receivables in May and August 2006, ¶¶ 138–40, 154–56, and then decreased both the loan loss allowance and the reserve coverage ratio, ¶¶ 220–22, even though the mortgage crisis was already reverberating across the country, and E*TRADE was acquiring more and more loans from unreliable originators with virtually no due diligence. These inadequate reserves ultimately forced E*TRADE to finally start increasing loan loss provisions in September 17, 2007, near the end of the Class Period. ¶ 243. Despite the high risks of E*TRADE's purchased loans, Defendants claimed that absolute dollar increases in loan loss provisions were "the result of growth in the loan portfolio" and are not indicative of a decline in overall asset quality," a representation alleged to be false, ¶¶ 138, 154, 196.

Because Defendants' allegedly false statements regarding loan loss reserves were with regards to the value of the Company's assets and the security of investing with the Company, they are alleged to be material.

### f. MBS and ABS Misrepresentations And Omissions Were Material

■ Defendants are alleged to have misrepresented and omitted material information concerning the quality and risks associated with E*TRADE's investment portfolio of ABS, MBS and CDOs, and failure to disclose that E*TRADE was experiencing significant impairments in ABS and MBS. During an April 18, 2007 conference call, Caplan reassured investors and denied credit exposure, stating that a lot of

the growth in Q1 MBS was "simply a fully hedged-out MBS, as a placeholder." ¶ 203. Also during the call, when asked whether E*TRADE had much in the line of credit exposure on its MBS, Caplan responded, "No. I think that we're AAA." ¶ 20. Defendants also continued to assure the market of the Company's high quality MBS and ABS portfolio; continued to understate exposure to risk; and continued to promote the "conservative approach to credit and funds management." See, e.g., ¶¶ 224, 229, 244, 246, 272.

It is alleged that both prior to and throughout the Class Period, Defendants mischaracterized ABS portfolio losses as merely temporary. ¶¶ 25–26, 126, 234. For instance, E*TRADE's 2Q 2007 10–Q, filed August 20, 2007, stated: "The Company does not believe that any individual unrealized loss as of June 30, 2007 represents an other-than-temporary impairment. The majority of the unrealized losses on mortgage backed securities are attributable to changes in interest rates and are not reflective of deterioration in the credit quality of the issuer and/or securitization." However, right after the Class Period (on November 29, 2007), E*TRADE was forced to sell its ABS portfolio for approximately 27 cents on the dollar. ¶¶ 25–26, 293, 369.

It is alleged that at the same time, as reported by the CWs, Caplan was speaking internally about the need to compensate for losses; the fact that E*TRADE was "so leveraged out"; E*TRADE's overexposure in the subprime market; the search for a "white knight" to rescue the Company from its "mortgage mess"; and Caplan's expectation that profits would go down and remain down. ¶¶ 94–99. On September 17, 2007, E*TRADE made a partial disclosure of an impairment on MBS of $100 million to be taken in the final two quarters of fiscal year 2007.

¶¶ 20, 242. In a second partial disclosure on October 17, 2007, that number was almost doubled to $197 million, to be taken in the third quarter of 2007. ¶¶ 20, 270. On November 9, 2007, the last day of the Class Period, E*TRADE revealed that its exposure to ABS, CDO and second-lien securities on September 30, 2007 was, in fact, approximately $450 million, ¶¶ 20, 279, 282, 23 19.6 million more than E*TRADE's net income for 2005 (which was $430.4 million, see Def. Ex. 3 (Dkt. No. 74–4)) and almost 72% of E*TRADE's net income for 2006 (which was $628.9 million for 2006, see ¶ 181).

The allegations referred to above are adequate to identify the statements alleged to be misleading, and the information alleged to be material which was omitted. The state of the knowledge of the Defendants remains as a triable issue.

## V. THE INADEQUACY OF THE ALLEGATIONS HAS NOT BEEN ESTABLISHED

The MTD has set forth defenses which at this pleading stage do not require the dismissal of the Complaint.

### a. *Misrepresentations Were Not Mere "Puffery"*

█ Defendants have contended that the alleged misstatements were "mere puffery" and, therefore, not actionable. However, misstatements regarding risk management, discipline, monitoring and credit quality are not "puffery" where, as alleged here, they were "misrepresentations of existing facts." *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir.2000) (statements that inventory situation was "in good shape" or "under control" when defendants knew the contrary was true were false and misleading) (citation omitted). See also *In re Xerox Corp. Sec. Litig.*, 165 F.Supp.2d 208, 218 (D.Conn.2001) (plaintiffs' allegations "go beyond claims of mere puffery" be-

cause defendants "made specific statements, including ... those characterized by the defendants as merely reflecting optimism, knowing they were contrary to the company's actual situation"). In *Countrywide*, 588 F.Supp.2d 1132, mortgage loan origination and quality allegations—remarkably similar to those alleged against E*TRADE—were held to be actionable because:

> the [complaint] adequately alleges that Countrywide's practices so departed from its public statements that even "high quality" became materially false or misleading; ... [T]o apply the puffery rule to such allegations would deny that "high quality" has any meaning.

*Id.* at 1144 (citations omitted).

In citing *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F.Supp.2d 348 (S.D.N.Y.2006), for their "puffery" argument, Defendants omit its findings that statements that wholesale banking remained a "sound business" and would continue to be a "growth proposition"; that defendants had "made appropriate, in fact, very conservative, we feel, provisions"; and that defendants were "very happy with the present situation" and had "already implemented measures to re-focus the business and reduce its risk profile" were actionable, because "these were not mere rosy predictions. Instead, they were directed at Abbey's then-existing financial condition and made at a time when defendants were aware or should have been aware of contrary information." *Id.* at 359–60. The dismissal of part of the statements in *Abbey* was due to the fact that those statements were not contradicted by sufficient particularized information. *Id.* at 357–58. The same statements can be actionable, where, as here, the statements are belied by conditions internally known by defendants. *Novak*, 216 F.3d at 315. Thus, *In re JP Morgan Chase Securities Litig.*, 363 F.Supp.2d 595 (S.D.N.Y. 2005), cited by Defendants, is also inapposite, because the statements touting risk management were not, as here, juxtaposed against detailed factual descriptions of the Company's woefully inadequate or non-existent credit risk procedures. See *id.* at 633.

The MTD contends that the Complaint challenges "statements regarding the 'lack of decline in asset quality.'" MTD at 13 n. 9. The Complaint challenges Defendants' actual statements such as: "We believe that these increases to the allowance [for loan losses in the real estate loans receivable portfolio] are the result of growth in the loan portfolio and do not indicate a decline in overall asset quality." ¶¶ 138, 154. "Quality" in this context is not an amorphous concept. Defendants denied that E*TRADE's real estate loan portfolio had become more risky—even though it is alleged that the risks had increased. See, e.g., ¶¶ 67–69, 74–75 (Defendants had drastically reduced due diligence); ¶¶ 68–69, 76–78 (Defendants were purchasing high-risk loans from unreliable originators); ¶¶ 72–73, 76–77 (Defendants' concerns and attempt to "balance" existing risks). Similarly, the MTD challenges the phrase "loan portfolio credit characteristics," MTD at 13, n. 9—but Caplan's actual statement (¶ 160) concerns specific "credit characteristics"—FICO scores and LTVs—which are alleged to have been misrepresented. See ¶ 302 (admission that Defendants did not update LTVs after origination); ¶ 91 (over appraisals, which would artificially understate LTVs).

Defendants' statements such as "[w]e are seeing significant organic growth in cash, assets and credit," ¶ 131, are alleged to misrepresent existing facts-that the vast majority of E*TRADE's loans were purchased from questionable outside lenders rather than puffery. *Novak*, 216 F.3d at

315. See also *Abbey*, 423 F.Supp.2d at 360–61 (bank business was sound and would continue to be a "growth proposition" was not a mere rosy prediction). "Organic growth" was also actionable because it was represented by Defendants to be the focus of E*TRADE's business. See, e.g., *In re Moody's Corp. Sec. Litig.*, 599 F.Supp.2d 493, 507–08 (S.D.N.Y.2009) (statement that Moody's was an independent body publishing ratings accurately and impartially was not "puffery" because independence was a cornerstone of Moody's business).

Defendants' other growth statements, such as "we enter 2007 ideally positioned to capitalize on secular growth trends in the industry," ¶ 181, are alleged to be statements of current condition and contradicted then existing internal distress at E*TRADE and Caplan's December 2006 admission to employees that he expected profits to be down then and throughout 2007. ¶¶ 95–98. For instance, in *In re Computer Associates Class Action Securities Litigation*, 75 F.Supp.2d 68 (E.D.N.Y. 1999), the court found actionable that the company had falsely portrayed itself as a "booming company which was experiencing and would continue to experience rapidly rising sales and profits on its core products and new product offerings, and as a company whose order pipeline was 'strong.'" *Id.* at 71. In *Manavazian v. Atec Group*, 160 F.Supp.2d 468 (E.D.N.Y.2001), it was not puffery when the company stated that it was "poised for future growth," occupied a "strategic position in the technology industry" and that it was "positioned ... for dramatic revenue and earnings growth model was 'still on track.'" *Id.* at 473–74. See also *Lapin v. Goldman Sachs Group*, 506 F.Supp.2d 221, 239 (S.D.N.Y.2006) (statement that "integrity and honesty are at the heart of our business," held actionable).

Because the misstatements regarding risk management, discipline, monitoring and credit quality are "misrepresentations of existing facts" *Novak*, 216 F.3d at 315, that would have misled a reasonable investor, see *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 811 (2d Cir.1996), they are actionable.

### b. *Present Knowledge Is Alleged Rather Than "Fraud by Hindsight"*

Defendants' "fraud by hindsight" arguments, MTD at 15–17, 29–30, mischaracterize the Complaint. See, e.g., *Xerox*, 165 F.Supp.2d, 208, 218 (D.Conn.2001) (fraud by hindsight "argument fails to properly characterize the [ ] complaint," which alleged that defendants made fraudulent statements simultaneously with their knowledge of problems resulting from the restructuring). As alleged in the Complaint, this is not a case of "failure to predict" riskiness or future mortgage market downturns but and instance where loans were internally known to be of poor quality, inadequately reviewed, improperly described and highly risky at the time they were purchased. ¶¶ 67–77. This case differs from *Denny v. Barber*, 576 F.2d 465 (2d Cir.1978), cited by Defendants, where the plaintiff failed to allege contemporaneous facts indicating the falsity of the defendants' statements and instead "simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones." *Id.* at 470. It is not "fraud by hindsight" when statements related to a loan's existing quality and risks were false and misleading when made. See *Hall v. The Children's Place Retail Stores, Inc.*, 580 F.Supp.2d 212, 229 (S.D.N.Y.2008) (rejecting "fraud by hindsight" argument where undisclosed breaches of license agreement, which placed agreement at risk of being termi-

nated, allegedly existed at the time of misstatements). Defendants' case citations also confirm that misstatements of existing fact are not mere fraud by hindsight. See, e.g., *In re Tower Auto. Sec. Litig.*, 483 F.Supp.2d 327, 342 (S.D.N.Y.2007) (a statement is false and misleading where it is adequately alleged "that Defendants had access to facts contrary to the alleged statement"). The cases which Defendants tout as in the context of the current financial crisis, see, e.g., *In re 2007 Novastar Fin., Inc., Sec. Litiq.*, No. 07–CV–0139, 2008 WL 2354367 (W.D.Mo. June 4, 2008), are inapposite in that they fail to compare false or misleading statements with contemporaneous information. See *id.*, at *2–3. Moreover, *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F.Supp.2d 210 (S.D.N.Y.2008), upheld scienter with respect to a second fund because certain defendants were "closely connected such that they would have had access to the information" which contradicted their representations. *Id.* at 229.

The Complaint sets forth that Defendants knowingly and/or recklessly purchased high-risk loan pools and ABS with inadequate due diligence, ¶¶ 67–69, 74–75, while contemporaneously assuring investors to the contrary. Defendants stated that E*TRADE's mortgage loans were "superprime," ¶¶ 170–73, 202, 211, when it is alleged that numerous contemporaneous facts, such as negative discrepancies in loan documentation, ¶ 78, returns of loan pools sold by E*TRADE because they were comprised of below subprime loans, ¶ 76, and subsequent admissions that LTVs were not updated, ¶ 302, established the falsity of the representation. See, e.g., *In re New Century*, 588 F.Supp.2d 1206, 1228 (C.D.Cal.2008) (upholding complaint alleging misrepresentations as to loan quality). The "current financial crisis" is not necessarily an absolute defense if it is alleged that defendants have misled the public as to the quality of their holdings. Defendants have sought to attribute E*TRADE's difficulties to "industry-wide" downgrades and "macro-economic" trends, also experienced by financial institutions Citigroup, UBS, and Merrill Lynch (MTD at 1, n. 1). However, these institutions are also defendants in securities fraud class actions in this District. See *In re UBS AG Sec. Litig.*, No. 07–CV–11225 (RJS); *In re Citigroup Inc. Sec. Litig.*, No. 07–CV–09901 (SHS); *In re Merrill Lynch & Co. Sec., Derivative and ERISA Litig.*, No. 07–CV–9633 (JSR) (lawsuit alleged that Merrill failed to properly disclose its exposure to subprime ABSA CDOs; settled in February 2009 for $475 million after motions to dismiss were briefed).

In light of the foregoing allegations, Plaintiffs have sufficiently pled that Defendants had present knowledge of the risk, and have not merely pled fraud-by-hindsight.

### c. *More Than Mismanagement Has Been Alleged*

*Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) established that where the conduct involves deception related to the mismanagement—and not mismanagement alone—the claims are actionable under the federal securities laws. See *id.* at 465–474, 97 S.Ct. 1292. The "mere fact that the conduct ... arguably constitutes mismanagement will not preclude a claim ... if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose a specific material fact resulting from that mismanagement." *In re Donna Karan Int'l Sec. Litig.*, No. 97–CV–2011, 1998 WL 637547, at *10 (E.D.N.Y. Aug. 14, 1998). Here it is alleged not that Defendants merely made bad business decisions or mismanaged the Company, but rather that

Defendants misled the public about E\*TRADE's business, operations, and value of its loan portfolio. ¶¶ 98–100, 279–83, 288–90, 300–02. See, e.g., *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927 (9th Cir.1993) ("deliberate failure to recognize problem loans, thus understating the [loan loss reserve], constituted an actionable omission or misrepresentation of existing fact … cannot be dismissed as a mere matter of internal mismanagement"). Defendants' minimal due diligence and reckless loan origination practices here were not merely "bad business decisions" but alleged to establish the falsity of Defendants' assurances to the market. See, e.g., *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F.Supp.2d 1132, 1186 (C.D.Cal.2008) (loan origination practices raised strong inference that "actual loan quality was lower than the borrower's FICO score and LTV ratio suggested because Countrywide misrepresented how lax its verification practices became").

Defendants' citations in support of their "mismanagement" argument establish that § 10(b) prohibits fraud rather than mismanagement. See MTD at 30–31. *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111 (2d Cir.1982), where there was full disclosure of relevant financial data, makes clear that "deception" is actionable. See *id.* at 115. Unlike *Decker*, Defendants' misrepresentations and omissions here prevented E\*TRADE's shareholders from obtaining accurate information concerning the Company's financial status. In *Lerner v. FNB Rochester Corp.*, 841 F.Supp. 97, 101 (W.D.N.Y.1993), plaintiffs failed to allege any specific, contemporaneous facts in support of their claims, *Id.* at 101–02. *Acito v. IMCERA Group*, 47 F.3d 47 (2d Cir. 1995) concerned the materiality of omissions related to relatively minor aspects of the company's businesses and was a pure mismanagement case because there was no duty to disclose. *Id.* at 52–53.

Because Plaintiffs allege that Defendants intentionally misled the public, rather than simply making bad business decisions, Plaintiffs have pled more than mere mismanagement.

### d. *Allegations Of Knowing Falsity Defeat The PSLRA Or "Bespeaks Caution" Defense*

■ The PSLRA's safe harbor protects only those forward looking statements that are "identified" as such and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i). Even where the safe harbor is triggered, it does not protect statements made with actual knowledge of falsity, as alleged here. See 15 U.S.C. § 78u–5(c)(1)(B). Defendants cannot be immunized for knowingly false statements even if they include some warnings: As the Honorable Milton Pollack explained, the law provides "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Ltd. P'ships Litiq.*, 930 F.Supp. 68, 72 (S.D.N.Y.1996). Additionally, risk disclosures will not insulate Defendants from liability where the risk allegedly disclosed has already occurred. See *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir.2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired"). The factual issue as to whether the risk has transpired does not make the allegations of the Complaint inadequate. The Defendants' general statements that loan losses and securities impairments "could be affected by market risks and were subject to change," MTD at 18, do

not insulate them from liability for their specific misstatements and omissions. See *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir.1992) ("if a defendant characterizes loan loss reserves as 'adequate' or 'solid' even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud"). Moreover, Defendants' misleading Class Period statements are alleged to have contradicted, and thus, nullified any risk disclosures. See, e.g., *Lapin v. Goldman Sachs Group*, 506 F.Supp.2d 221, 238 (S.D.N.Y.2006) (plaintiffs sufficiently pled that defendants' multiple disclosures did not counterbalance defendants' misleading statements); *In re Credit Suisse–AOL Sec. Litig.*, 465 F.Supp.2d 34, 50 n. 17 (D.Mass.2006) (fact that defendants continued to publish optimistic assessments of the company's financial position was "akin to a statement that the reader need not worry much about the generic risk disclosures that appeared from time to time").[4]

Because Defendants are alleged to have made knowingly false statements they are not protected by the PSLRA safe harbor provision. Additionally their risk disclosures were insufficient to counterbalance their allegedly misleading statements.

### e. *Loan Loss Allowances Are Not Projections*

■ Defendants' argument that "loan loss allowances and securities impairments were projections about future performance," MTD at 36, misstates GAAP and SEC disclosure requirements, which provide that "allowances for loan losses should be based on past events and current economic conditions."[5] In *Atlas v. Accredited Home Lenders Holding Co.*, 556 F.Supp.2d 1142 (S.D.Cal.2008), a mortgage lender's reduction of its loan loss reserves when credit quality was decreasing (just like E*TRADE did) was held to violate GAAP and be materially false and misleading. *Id.* at 1150, 1156. Defendants' sole support for their proposition that E*TRADE's loan loss reserve was a "projection [ ] about future performance," is dictum from a state derivative case, analyzing the business judgment rule, which notes the unremarkable notion that loan loss reserves involve some discretion. MTD at 37 (quoting *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F.Supp.2d 1044, 1070 (C.D.Cal. 2008)).

Therefore Defendants' argument that "loan loss allowances and securities impairments were projections about future performance" fails as a matter of law.

### f. *The Liability Of Individual Defendants For The Class Period Statements Is Adequately Alleged*

The Complaint specifically alleges the time, place and content of each Individual Defendant's material misrepresentations and omissions. Caplan, Simmons and Webb are all liable for each of the false and misleading statements made during the Class Period. Caplan was quoted in press releases. ¶¶ 143, 159,174, 181, 198, 200, 209–10, 243, 268. Each made false and misleading statements during conference calls and/or conferences. Caplan:

---

**4.** In *N.Y. Cmty. Bancorp Inc. Secs. Litig.*, 448 F.Supp.2d 466 (E.D.N.Y.2006), cited by Defendants, defendants "frankly disclosed" specific potential downside interest-rate volatility figures. *Id.* at 479–80. "In this light, the [defendants' statements] concerning the company's risk-aversion to interest rate increases were permissible." *Id.* (emphasis added). Such "frank disclosures" were not made here. Defendants are alleged not to have provided critical data needed for E*TRADE's investors to draw their own conclusions.

**5.** Current Accounting and Disclosure Issues in the Division of Corporation Finance, Dec. 1, 2005, available at http://www.sec.gov/divisions/corpfin/acctdis120105.pdf, at 52.

¶¶ 7, 9–11, 20–31, 144–46, 148, 160, 168, 172, 175, 182–83, 188, 201–03, 211–14, 220, 253–54, 256, 270–71; Simmons: ¶¶ 132, 177, 185, 204, 212, 255; Webb: ¶¶ 9, 183, 257. Caplan and Simmons both signed[6] and certified E\*TRADE's 10–K and 10Qs which contained false and misleading statements. ¶¶ 135–40, 151–57, 162–65, 207–08, 191–93, 195–96. Webb necessarily supplied false and misleading information concerning EGAM (which he headed), contained in E\*TRADE's filings.[7]

■ Senior officers may also be held liable for statements made by others. See, e.g., *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75–76 (2d Cir.2001) (vice president for finance and investor relations responsible for company's communications with investors who had access to internal data may be liable for false and misleading statements even though they were not publicly attributable to him); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471 (2d Cir.1996) ("Primary liability may be im-posed not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.") (internal quotation marks and citation omitted). Further, each of the Individual Defendants is liable for the others' statements made at conference calls in which they participated. "[A]high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements. If nothing else, the [ ] official is at fault for a material omission in failing to correct such statements in that context." *In re SmarTalk*, 124 F.Supp.2d 527, 543 (S.D.Ohio 2000). See also *Barrie v. Intervoice–Brite, Inc.*, 409 F.3d 653, 656 (5th Cir.2005). See ¶¶ 9, 182–85, 187, 253–57, 259.

■ The Individual Defendants are also alleged to be liable under the "group-pleading doctrine,"[8] which permits a plain-

---

**6.** "[T]hose who sign the documents (even if there are no facts showing they were involved in the preparation) can be held liable as a primary violator of § 10(b) for making a false statement." *In re Petco Animal Supplies Inc. Sec. Litig.*, No. 05–CV–0823, 2005 WL 5957816, at \*15 (S.D.Cal. Aug. 1, 2005) (citation omitted). See also *In re Lernout & Hauspie Sec. Litig.*, 230 F.Supp.2d 152, 163 (D.Mass.2002) ("It is well established ... that each defendant may be held responsible for the false and misleading statements contained in the financial statements he signed [under § 10(b) ]").

**7.** See *SEC v. Wolfson*, 539 F.3d 1249, 1261 (10th Cir.2008) ("That the filings were issued in F10's name, and that [defendant] himself did not sign, certify, or physically file the documents, is not dispositive. The relevant question is only whether he can fairly be said to have caused F10 to make the relevant statements, and whether he knew or should have known that the statements would reach investors"); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n. 5 (9th Cir.2000) ("participation or intricate involvement in the prepa-ration of fraudulent statements is grounds for primary liability even though that participation might not lead to the actor's actual making of the statements"); *McNamara v. Bre–X Minerals Ltd.*, 57 F.Supp.2d 396, 429 (E.D.Tex.1999) ("if a defendant played a 'significant role' in preparing a false statement actually uttered by another, primary liability will lie").

**8.** Individual Defendants were each "individuals with direct involvement in the everyday business" of E\*TRADE. See, e.g., ¶¶ 44–46 (enumerating the Individual Defendants' particular roles and their involvement with the everyday business of E\*TRADE). See *In re Pfizer Inc. Sec. Litig.*, 584 F.Supp.2d 621, 638 (S.D.N.Y.2008) ("Plaintiffs allege that all of the Individual Defendants ... were directly involved with the day-to-day operations of the company, and that all participated in drafting, reviewing, approving, ratifying, and/or disseminating the [ ] financial statements and press releases during the Class Period ... these allegations are sufficient"). See also *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999).

tiff, "for pleading purposes only, to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *In re BISYS Sec. Litig.,* 397 F.Supp.2d 430, 438 (S.D.N.Y.2005) (internal quotations and citations omitted). See also *In re Refco, Inc. Sec. Litig.,* 503 F.Supp.2d 611, 641 (S.D.N.Y.2007) (same).

In light of the allegations against the Individual Defendants for having made or being otherwise liable misleading statements, they have been adequately impleaded in the Complaint.

## VI. PLAINTIFFS ADEQUATELY ALLEGED SCIENTER

▮ The requisite state of mind in 10b–5 claims is "intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights Ltd.,* 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citation omitted). The Second Circuit has provided at least five non-exclusive examples of how a plaintiff may adequately plead scienter-namely, allegations that the defendants: "(1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor," *Novak v. Kasaks,* 216 F.3d 300, 311 (2d Cir.2000) (internal cross references omitted), or (5) "ignored obvious signs of fraud." *Id.* at 308. See also *Chill v. General Elec. Co.,* 101 F.3d 263, 269 (2d Cir. 1996) ("An egregious refusal to see the obvious, or to investigate the doubtful, may ... give rise to an inference of recklessness.") (internal citations and quotations omitted); *Heller v. Goldin Restructuring*

*Fund,* 590 F.Supp.2d 603, 619 (S.D.N.Y. 2008) (same). The inquiry on scienter "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 323, 127 S.Ct. 2499 (underlined emphasis omitted). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs,* 551 U.S. at 324, 127 S.Ct. 2499 (internal citations omitted). An inference "at least as likely as competing inferences" warrants recovery. *Id.* at 324 n. 5, 127 S.Ct. 2499. See also *City of Brockton Ret. Sys. v. Shaw Group Inc.,* 540 F.Supp.2d 464, 472 (S.D.N.Y.2008) (the "tie ... goes to the plaintiff").

The Defendants have contended that two CWs' accounts that Caplan told employees in early December 2006 that E\*TRADE was experiencing losses and expected more losses in 2007, ¶ 98, were "too vague to support a strong inference of scienter," MTD at 34, without viewing these allegations collectively with, e.g., Caplan's hiring of CW2 and CW5 to try to balance high mortgage risks, ¶¶ 72–73, followed by Caplan's drastic reductions in the loan review staff, ¶ 75, and Webb's refusal to restructure risky loan portfolios because EGAM would realize the loss. ¶ 71.

Information from confidential witnesses can be relied upon "provided [the confidential witnesses] are described ... with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak,* 216 F.3d at 314. Plaintiffs have pled with particularity the knowledgeable positions occupied by each of the CWs, ¶ 2, many of whom had first-hand interactions with the Defendants concerning the matters alleged in the Com-

plaint. See, e.g., ¶ 71 (CW8 repeatedly recommended to Webb for months that a mortgage portfolio w as insufficiently hedged and needed to be restructured, but Webb refused because it would mean taking a loss on the portfolio); ¶ 76 (CW5 observed Webb's purchases of extremely risky products, and observed Caplan working closely with EGAM on these purchases, and losses of value in EGAM's loans); ¶ 82 ("CW4 reported that in some cases, every loan in the samples he saw was risky." CW4, in a meeting attended by Webb, asked: "What do you do when they are all high risk?" and "Shouldn't we be reviewing all of the loans in the portfolio?" CW4 was told "no," and that all the loans should not be reviewed); ¶ 89 (CW2 was so shocked at how poorly E*TRADE was run that CW2 quit after two weeks, but stayed at Caplan's and COO Lilien's request); ¶ 98 (In early December 2006, Caplan told E*TRADE employees (including CW14 and CW16) "confidentially," in a meeting attended by Simmons, Webb, and Lilien, that E*TRADE was experiencing losses and expected more losses in 2007); ¶ 99 (CW11 and CW13 attended internal town hall meeting where Caplan acknowledged that E*TRADE was overexposed in the subprime market and was waiting for a "white knight" to "get them out of the mortgage mess").

As in *Countrywide*, "Plaintiffs' numerous confidential witnesses support a strong inference of a Company-wide culture that, at every level, emphasized increased loan origination volume in derogation of underwriting standards." 554 F.Supp.2d at 1058. The fact that this case involves "[c]orroboration from multiple sources also supports an inference of a scienter." *Id.* at 1058 (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 513 F.3d 702, 712 (7th Cir.2008)). The CWs here also "emanate from several geographic areas" and "span different levels of the Company hierarchy"

which further support a scienter finding. *Id.* at 1058–69. A comprehensive survey of employees is not needed at the pleading stage. *Id.* at 1059 n. 10 (rejecting defense argument that plaintiffs only used 14 "former mostly low-level employees out of more than 50,000 in 600 offices").

CW6's reports to management of huge numbers of loans with negative discrepancies, questions to management as to why it was keeping bad loans, responses from management that E*TRADE wanted to maintain strong relationships with originators, and reports that E*TRADE was unable to sell bad loans to Bear Stearns or others, ¶ 78, allege the type of back and forth that could establish top management's involvement and knowledge, particularly when combined with all the other reports of Defendants' direct involvement in EGAM. ¶¶ 67–118.

Moreover, in accordance with Supreme Court's instruction in *Tellabs*, CWs' information must be viewed together. CW3's allegations regarding Caplan's visit to CW3's offices to push employees to originate more mortgages together with CW9's report of Caplan's attempt to push CW9 to sell more mortgages, during which Caplan told CW9 that E*TRADE was trying to "somehow compensate for losses" because they were "so leveraged out", ¶ 95, together with numerous other reports of Caplan's and other Defendants' direct involvement and knowledge, see, e.g., ¶¶ 72–73, 75–78, 82, 84, 89, 98–99.47, constitute adequate allegations of scienter.

 Plaintiffs have plead that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 311. Such "allegations alone are enough to satisfy the pleading requirement for scienter." *Heller*, 590 F.Supp.2d at 622 (defendants' knowledge of undercapi-

talization that contradicted their public statements alone satisfied scienter).

The cases cited by Defendants, MTD at 33, are distinguishable. In *Steinberg v. Ericsson LM Tel. Co.*, No. 07–CV–9615, 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008), and *In re DRDGold Ltd.*, 472 F.Supp.2d 562, 572 (S.D.N.Y.2007), the complaints did not identify any conversation where information was provided to Defendants that was contrary to public statements. Further, in *Steinberg*, the three witnesses claimed no contact with Defendants, or even the headquarters where the fraud occurred. 2008 WL 5170640, at *13. Here, the Complaint makes reference to sixteen CWs, who provide accounts of what they told Defendants, what Defendants knew, and/or what was discussed internally that is alleged to be contrary to Class Period statements.

While publicly claiming that E*TRADE's business was conservative, involving strict underwriting and loan purchasing discipline with respect to loan portfolio credit quality, Defendants frequently spoke internally about money to be made from their purchased high risk loans, ¶¶ 15, 70; acknowledged the high risk nature of the loans-and, in fact, hired executives in a desperate attempt to "balance" these risks, ¶¶ 14, 72, 73; and admitted that E*TRADE was experiencing and expected more losses. ¶ 16. CWs reported insufficiently hedged mortgage portfolios directly to Webb, who refused to reduce the risk. ¶ 71. These meetings, where the problems at issue were directly discussed with Defendants, evidence scienter. See, e.g., *Akerman v. Arotech Corp.*, 608 F.Supp.2d 372, 387 (E.D.N.Y.2009) (upholding scienter based on meetings with defendants "to discuss the difficulties"); *In re Moody's Corp. Sec. Litig.*, 599 F.Supp.2d 493, 515 (finding scienter when defendant made statements revealing that he knew the company's ratings were compromised).

Caplan and Webb also directed the purchase of E*TRADE's facially high risk loans from problem ridden originators with minimal to no due diligence. ¶¶ 15, 18, 74–86. Webb ran EGAM, which purchased the risky loans under his direction. ¶¶ 69, 71. Caplan made the drastic structural changes in E*TRADE's mortgage division which included eliminating staff charged with reviewing and monitoring loans. ¶¶ 67–69, 71, 347. Webb and Caplan both worked closely and directly with EGAM personnel. ¶ 347. Moreover, additional direct conversations with Individual Defendants, meetings at which Individual Defendants were present, and visits by Individual Defendants to EGAM demonstrate their access to and actual knowledge of facts which contradicted their public statements. See ¶ 82 (Webb's instruction to CW4 to stop reviews of loan pools containing poor quality samples). See also ¶¶ 91, 95. In addition, E*TRADE's inability to sell its troubled loans to other institutions because the loans were so "terrible," ¶¶ 76, 78, is alleged to have provided Defendants with obvious knowledge of their quality. The Plaintiffs have alleged that Defendants were aware of E*TRADE's true condition and that their public statements were materially false and misleading.

Simmons' first-hand involvement is adequately pled. Errors in valuing a loan portfolio of $3 billion dollars, which needed to be downwardly repriced, was reported directly to Simmons. ¶ 84. All of E*TRADE's executives are alleged to have been in frequent communication with one another and their reports. ¶ 321. Simmons is alleged to have been also present at the early December 2006 meeting where Caplan discussed present and future losses, ¶ 98, but nonetheless, made contradic-

tory assurances to investors on December 14, 2006. See, e.g., ¶ 177 ("As a result of our disciplined growth in the balance sheet, we expect to see continued growth in net interest income in 2007"). Simmons' other reassurances to investors throughout the Class Period regarding the key issues in this case, ¶¶ 132, 185, 212, 255, and his responsibilities as E*TRADE's chief financial and accounting officer, further evidence his scienter. See *Countrywide*, 588 F.Supp.2d at 1195 (the "only plausible alternative inference to a strong inference of scienter as to [COO whose primary job was to oversee company's operations, and who publicly stated that certain loans were *all high FICO'] is gross recklessness. That inference is less compelling than one of actual knowledge or intent."); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 491 (S.D.N.Y.2004) ("Key corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements") (citation omitted); *Hubbard v. BankAtlantic Bancorp, Inc.*, No. 07–CV–61543, Order, at 7 n. 6, 2009 WL 3261941 (S.D.Fla. May 11, 2009) (finding scienter based on position as CFO because his job would be to monitor loan loss reserves and therefore he either knew or was reckless in not knowing that the loss reserves were materially understated) (Pl's Mem. In Opp'n, Ex. B).

It is also alleged that Defendants' misstatements concerned a "core" operation-EGAM's mortgage-based investments which E*TRADE depended upon for much of its financial results establish scienter. See, e.g., *In re JP Morgan Chase Sec. Litig.*, 363 F.Supp.2d 595, 628 (S.D.N.Y. 2005) (information at the core of a company's business "may be properly ascribable to senior officers") (citation omitted); *Makor*, 513 F.3d at 711 ("it is exceedingly unlikely" that CEO "was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives"); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F.Supp.2d 314, 325–326 (S.D.N.Y.2001) (courts reasonably assume "that principal managers [ ] are aware of matters central to that business's operation") (citing cases).

E*TRADE admitted after the Class Period, its exposure to ABS, CDO and second-lien securities on September 30, 2007 was, in fact, approximately $450 million, ¶¶ 20, 279, 282, which, for example, was $19.6 million more than E*TRADE's entire net income for 2005. Courts have recognized that the magnitude of write-offs alleged to be the subject of the misstatements supports a strong inference of scienter. See *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir.2001).[9]

"GAAP violations, when coupled with evidence of fraudulent intent" provide evidence of scienter. *SEC v. DCI Telecomms.*, 122 F.Supp.2d 495, 500 (S.D.N.Y.

**9.** See also *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir.2000) (agreeing that the magnitude of write-offs involved "renders less credible" defendants' argument that they acted without scienter); *Atlas Air Worldwide Holdings Inc., Sec. Litig.*, 324 F.Supp.2d 474, 489 (S.D.N.Y. 2004) ("the mere fact that the company had to make a large correction is some evidence of scienter"); *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir.2001) ("[T]he sheer size of the [ ] write-down adds to the inference that the defendants must have been aware the problem was brewing"); *Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246, 1256 (N.D.Ill.1997) ("The more serious the error, the less believable are defendants' protests that they were completely unaware of [the Company's] true financial status and the stronger the inference that defendants must have known about the discrepancy.").

2000).[10] As set forth in the Complaint, ¶¶ 333–76, it is alleged that Defendants violated numerous GAAP provisions, including SFAS 5 and 114, with respect to, for example, loan loss provisions and ABS adjustments. Incredibly, as Defendants added high-risk loans to the balance sheet, their loan loss provisions decreased. See, e.g., ¶¶ 220–21, 347. Moreover, Defendants adopted a novel proprietary method of calculating mortgage risk that understated the amount of loan loss reserves required. ¶¶ 349–51.

Although personal pecuniary motive is not required to plead scienter, see *Tellabs*, 551 U.S. at 325, 127 S.Ct. 2499, Defendants' stock sales also support an inference of scienter. See *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F.Supp.2d 88, 99 (S.D.N.Y.2006) ("Scienter can be alleged in two ways: by pleading facts that evidence conscious misbehavior or recklessness or by pleading facts that evidence defendant's motive and opportunity to commit fraud"). "[M]otive is adequately alleged where the plaintiffs allege that the defendants sold their own shares while at the same time misrepresenting corporate performance in order to inflate stock prices." *In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 646 (S.D.N.Y.2007), See also *id.* at 645 (concealing information to drive up demand for shares, which would result in purchases of shares from which defendants would be compensated, was "a concrete benefit,"

and was sufficient to show motive) (citation omitted). "The Second Circuit has held that motive is adequately alleged where the defendants who made false statements inflating the value of shares 'sold tens of thousands of shares during the period that the allegedly defrauded customers were purchasing them.'" *Id.* at 646 (citation omitted).

It is alleged that Simmons and Webb's knowledge of the fraud and access to information belying their public statements, establishing scienter. In addition, the stock sales during the Class Period by Webb (229,000 shares for $5,727,000) and Simmons (241,730 shares for $5,864,512) provides further evidence of their scienter. Simmons' and Webb's Rule 10b5–1 trading plans-adopted during the Class Period-to dispose of significant amounts of stock during the Class Period may evidence scienter. A Rule 10b5–1 trading plan may give rise to an inference of scienter because "a clever insider might 'maximize' their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5–1 plan." See *In re Immucor Inc. Sec. Litig.*, No. 05–CV–2276, 2006 WL 3000133, at *18 n. 8 (N.D.Ga. Oct. 4, 2006). Here, it is alleged that Defendants were already aware of the Company's mortgage exposure time bombs at the time Simmons and Webb adopted their trading plans, ¶¶ 14, 67–99. Further, "[T]he existence of

---

**10.** See also *Scholastic*, 252 F.3d at 77 (actions contrary to expressed accounting policy "can form the basis for proof of recklessness"; scienter evidenced by a delay before taking special charge for returns despite statements that management gave considerable attention to monitoring returns); *In re Daou Sys. Inc.*, 411 F.3d 1006, 1016 (9th Cir.2005); *Lewin v. Lipper Convertibles, L.P.*, No. 03–CV–1117, 2004 WL 1077930, at *2 (S.D.N.Y. May 13, 2004) (repeated GAAP violations can provide strong scienter inference). Indeed, Defendants' own case citation states

that "[s]ignificant GAAP violations, described with particularity, may provide 'powerful indirect evidence of scienter.'" *Countrywide*, 554 F.Supp.2d at 1069 (MTD at 37). Although Countrywide found that inadequately pleaded loan loss reserves allegations were insufficient to independently evidence scienter, the court noted that low reserves followed by a drastic increase in reserves is "suggestive" of scienter, "especially given that riskier loans may require greater reserves." 554 F.Supp.2d at 1070.

a Rule 10b5–1 Trading Plan is an affirmative defense that must be pled and proved." *Malin v. XL Cap. Ltd.*, 499 F.Supp.2d 117, 156 (D.Conn.2007) (citing 17 C.F.R. § 240.10b5–1(c)(1)(i)). And, as the Court noted in EVCI, "The fact that there might be an innocent explanation for the timing of [defendant]'s sale is not enough to defeat the inference of scienter that arises from plaintiffs' well-pleaded allegations—which, as defendants keep forgetting, I must accept as true for purposes of this motion to dismiss." *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F.Supp.2d 88, 100 (S.D.N.Y.2006). Trading plans are not a cognizable defense to scienter allegations on a motion to dismiss where, as here, they were adopted during the Class Period. See *Central Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 (5th Cir.2007) (rejecting defendant's attempt to use 10b5–1 plan as a "non-suspicious explanation" because defendant entered into plan during the class period); *In re Biogen Idec, Inc. Sec. Litig.*, No. 05–10400, 2008 WL 4810045, at *14 (D.Mass. Oct. 25, 2008) ("The attempt to use such trading plans as a non-suspicious explanation is undermined ... when such plans are entered into during the Class Period"). Defendants' arguments and case citations regarding Simmons' and Webb's trading plans are inapposite. *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F.Supp.2d 323, 344 (W.D.N.Y.2008) (no indication of when plan was adopted); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 n. 11 (9th Cir.2008) (same); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F.Supp.2d 574, 604 (S.D.N.Y.2007) (plaintiffs failed to specify defendants' knowledge at time plan was adopted); *Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 185 (4th Cir.2007) (no trading plan mentioned); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir.2002) (same).

*Teachers* and *Vantive* discuss the length of the class period—but never relate class period length to a trading plan. Moreover, the Ninth Circuit's opinion as to what is an "unusually long" class period has no relevance in the Second Circuit. The sole case Defendants cite in the Second Circuit. *Malin,* involved a 24–month class period—five months longer than the present case, and also refused to consider the trading plan as a defense to scienter. 499 F.Supp.2d at 156.

Caplan's direct knowledge and access to information are sufficiently alleged to establish scienter. In addition, Caplan sold 72,211 shares during the Class Period, for proceeds of $1,738,971. ¶¶ 327. Even if Caplan made this sale to cover the exercise price and taxes for options that were expiring, as Defendants argue, MTD at 26, Caplan acquired shares at no cost to him, which does not demonstrate lack of scienter. Where a defendant may have believed that he could eventually sell his shares at a profit by continuing to hide the fraud or by resolving undisclosed problems without the public learning of the true facts, courts refuse to hold that defendants' stock purchases were inconsistent with fraud. See *Refco,* 503 F.Supp.2d at 646–47 (rejecting argument that defendants' stock purchases of stock were inconsistent with fraud, because defendants might have believed that uncollectible receivables could be hidden indefinitely or disposed of and that company's stock would accordingly continue to rise).

Because Plaintiffs have alleged that Defendants were aware of or had access to information contrary to their public statements, that the misstatements concerned E*TRADE's core operations, that Defendants violated GAAP provisions, and that Defendants benefited from the from the misrepresentations through stock sale, Plaintiffs have adequately pled scienter.

## VII. LOSS CAUSATION IS ADE-QUATELY PLED

 In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), the Supreme Court explained that the pleading rules for loss causation were "not meant to impose a great burden upon a plaintiff," and that plaintiffs need only plead "a short and plain statement," pursuant to Fed.R.Civ.P. 8(a)(2), that provides defendants with "some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 346–47, 125 S.Ct. 1627 (citations omitted). There is no heightened standard for pleading loss causation. See *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F.Supp.2d 148, 163 (S.D.N.Y.2008). For pleading purposes, loss causation exists "if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir.2005).

A "corrective disclosure" is not required under this Court's post-*Dura* case law. *In re Parmalat Sec. Litig.*, 375 F.Supp.2d 278, 305–06 (S.D.N.Y.2005) ("a corrective disclosure is not necessary where, as here, plaintiffs allege that the subject of the misrepresentations and omissions caused their loss") (analyzing Second Circuit cases). A risk allegedly concealed by defendants which materialized and arguably caused the decline in shareholder value suffices. *Id.* at 307. See also *Heller*, 590 F.Supp.2d at 624 (loss causation satisfied by allegations that plaintiff's loss was caused by foreseeable materialization of concealed risk of fund's undercapitalization). Here, the materialization of concealed risks and information regarding the quality of E*TRADE's mortgage investments sufficed to plead loss causation. See *Emergent Cap. Inv. Mgmt., LLC v.*

*Stonepath Group, Inc.*, 343 F.3d 189, 198–99 (2d Cir.2003) (cited with approval in *Dura*, 544 U.S. at 344–45, 125 S.Ct. 1627).

Moreover, neither the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading standard require a corrective disclosure be a "mirror image" tantamount to a confession of fraud. Because corporate wrongdoers rarely admit that they committed fraud, "it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005). Thus, the "relevant truth" required under *Dura* is not that a fraud was committed per se, but that the "truth" about the company's underlying condition, when revealed, causes the "economic loss."

Further, partial disclosures can satisfy the loss causation requirement. See *Dura*, 544 U.S. at 342, 125 S.Ct. 1627 (loss causation met where shares sold after "the relevant truth begins to leak out.") See also *In re Vivendi Universal, S.A. Sec. Litig.*, 605 F.Supp.2d 586, 599–600 (S.D.N.Y.2009) (same). It is also "clear that a corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events." *Bristol Myers*, 586 F.Supp.2d at 165.

 Here it is alleged that E*TRADE partially disclosed a $30 million increased provision for loan losses on July 25, 2007, but continued to emphasize "record performance," improved revenue and earnings quality, strict discipline regarding risk mitigation and reduced charge offs, resulting in a $1.41 per share partial stock price decline. ¶ 310. Likewise, on September 17, 2007, E*TRADE partially disclosed that it was exiting the wholesale mortgage business, revising 2007 earnings guidance downwards, and setting aside $245 million

for second half year loan losses, but continued to falsely promote its "conservative approach," "high FICOs, low LTVs and high owner occupancy levels," "loan risk mitigation discipline" and "excess collateralization," resulting in a $0.12 per share partial stock price decline. ¶¶ 311–13. The alleged disclosures in the Complaint each reflected the partial "materialization[s] of the concealed risk[s]," *Lentell*, 396 F.3d at 173, and are directly linked to alleged previous misrepresentations and/or omissions and to resulting declines in E*TRADE's stock price. See, e.g., ¶¶ 306–20. Defendants' false and misleading statements are alleged to have caused the price of E*TRADE stock to be artificially inflated, ¶ 309; and E*TRADE's partial and end-of-Class Period disclosures caused the stock to decline, ¶¶ 311–18, and investors' substantial losses. ¶¶ 36–41; Complaint, Exs. A–E. However, Defendants' reassurances to investors and incomplete, partial disclosures did not reveal the full truth about the risks and true performance of E*TRADE's portfolio.

On November 9, 2007, the last day of the Class Period, E*TRADE revealed $450 million of additional losses in its MBS portfolio, asset-backed CDO and second-lien securities exposure, and larger write-downs; withdrew guidance; and announced that the SEC had commenced an investigation which it is alleged resulted in a 58.67% one day drop in share price, and a multi-billion dollar "run on the bank" by E*TRADE customers, resulting from the public learning of the scope and severity of E*TRADE's risky investments and losses. ¶¶ 279–87, 314. The market's reaction to the disclosures evidences Defendants' concealment of much of the Company's investment risk up until the end of the Class Period. Plaintiffs here have clearly pleaded that the "share price fell significantly after the truth became known." *Dura*, 544 U.S. at 347, 125 S.Ct. 1627.

Defendants' contention that the November 9, 2007 stock price drop was due to "new events" rather than a corrective disclosure, MTD at 39, constitutes an issue of fact at this juncture and is not supported by the allegations of the Complaint. Moreover, according to the Plaintiffs, the circumstances which Defendants characterize "new events" (such as the SEC investigation and ratings downgrades) actually corrected misstatements and/or materialized concealed risks, concerning, e.g., Defendants' purchase of risky loan pools, inadequate due diligence, and failure to record timely balance sheets adjustments. See *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F.Supp.2d 822, 828–29 (D.N.J.2006) (announcement of an informal SEC inquiry at the end of the class period that did not disclose the reason for the inquiry, but resulted in significant stock price drop, was sufficient to connect that price drop to the improprieties that triggered the SEC inquiry, even though the nature of the improprieties was revealed later).

A number of "[o]ther courts have found that similar allegations of significant stock drops in response to announced SEC investigations are sufficient to plead loss causation under the framework established by *Dura* and its progeny." *In re Take-Two Interactive Sec. Litig.*, 551 F.Supp.2d 247, 287 (S.D.N.Y.2008) (collecting cases). In *Take-Two*, a 7.5% drop in share price in response to an announcement that the SEC was "conducting an informal nonpublic investigation into certain stock option grants made by the Company" sufficed to plead loss causation. *Id.* at 282. The price drop here in response to a relevant SEC investigation was eight times larger, and pleads loss causation. Moreover, the SEC investigation was linked to the purportedly fraudulent misconduct, and thus was "akin to a corrective disclosure," *Bristol Myers*,

204

586 F.Supp.2d at 165, and was not merely "'bad news' followed by a stock price decline." *Id.* at 164.

The other item which Defendants characterized as a "new" development, namely, declines in the value of E*TRADE's securities "consistent with" rating agency securities downgrades, ¶ 279, simply reflected a correction of the previous inaccurate ratings stemming from Defendants' successful misstatement and omissions regarding the inherent risks of E*TRADE' high-risk portfolio. *In re Vivendi Universal, S.A., Sec. Litig.*, 605 F.Supp.2d 586, 598 (S.D.N.Y.2009) ("A ratings downgrade reveals the risk of deteriorating liquidity ... if the company had previously concealed its liquidity condition ... by making false or misleading statements, these events may be sufficiently related to the fraud to qualify as materializations of the risk").

Defendants have not established at this stage in the action that the risks which materialized here were unforeseeable as a matter of law. To prove that a loss-inducing event was foreseeable, Plaintiffs merely need to "establish that the risk of the event occurring 'was within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor.'" *Id.* (quoting *Lentell*, 396 F.3d at 173). SEC investigations and rating agency downgrades were within the concealed "zone of risk" emanating from E*TRADE's practices.

In light of the allegations set forth in the Complaint and recounted above, Plaintiffs have sufficiently pled loss causation.

## VIII. THE BROWER LETTER DOES NOT REQUIRE A SHORTENED CLASS PERIOD

The Defendants have contended that Plaintiffs' lead attorney's September 11, 2008 letter (the "Brower Letter,"

MTD, Ex. 15) requires the Plaintiffs to end the Class Period on September 17, 2007 having stated that the events giving rise to the action were revealed in September 2007, MTD at 40. Judicial estoppel applies when a "clearly inconsistent position" has been adopted by the court in a prior proceeding, *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 57 (S.D.N.Y.1999).

The Court did not "adopt" a position that was clearly inconsistent with the Complaint. The Brower Letter sought relief which was unrelated to, and did not depend upon the date the Class Period ended. Nor did the September 22, 2008 so-ordered stipulation of all parties explicitly or implicitly adopt a position that Defendants' revelations were all made in September 2007. The Brower Letter complained that, after lead counsel was appointed here, Defendants violated a prior Court-ordered stipulation consolidating all subsequently filed related cases (the August 28, 2008 "Consolidation Order") by entering into a secret, partial consolidation stipulation with another plaintiff group (the "Tate" plaintiffs), that was presented to the Court without advising Court-appointed lead counsel. The Tate action was thereupon stayed. The Brower Letter's reference to Defendants' September 2007 revelations had no impact on either Defendants' subsequent agreement or the Court's endorsement of that agreement to vacate the Tate Stipulation or the Court's reform of the record. See Brower Letter (MTD Ex. 15, at 1, basing request to stay the Tate action on the Consolidation Order); MTD. Ex. 16 (Sept. 22, 2008 Stipulation, at 2, whereas clause, referencing the Court's Consolidation Order as the basis for the stay relief). See also *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 198 F.3d 342, 346 (2d Cir.1999) ("[c]ollateral estoppel ... bars the relitigation of issues actually litigated and de-

cided in the prior proceeding, as long as that determination was essential to that judgment") (citation omitted).

Also, judicial estoppel does not apply here because the allegedly "inconsistent" position was taken in the current proceeding, and this Court had already determined—after full briefing and argument—the Class Period at issue. "[T]he Second Circuit has consistently required as a prerequisite that the inconsistent position be taken in a 'prior preceding,' ... Because their prior motion was ... part of the current proceeding, judicial estoppel cannot apply." *In re Omnicom Group, Inc. Sec. Litig.*, No. 02–CV–4483, 2007 WL 2376170, at *6 (S.D.N.Y. Aug. 10, 2007).

This Court's July 16, 2008 decision, 2008 WL 2876373 (Dkt. No. 59) appointed lead plaintiffs and counsel for a class period ending on November 9, 2007. *Id.* at 1. As the decision noted, five initial complaints were filed here—three were filed in October 2007 alleging a September 25, 2007 class period end date, and two were filed in November 2007 alleging a November 9, 2007 class period end date. *Id.* at 3. The Brower Letter mistakenly referenced the September date used in the first three complaints. Moreover, the Complaint supersedes any earlier statements in a letter regarding this case. See *Dluhos v. Floating & Abandoned Vessel*, 162 F.3d 63, 68 (2d Cir.1998) ("[i]t is well established that an amended complaint [ ] supersedes the original, and renders it of no legal effect"); *County of Riverside v. McLaughlin*, 500 U.S. 44, 48, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (second amended complaint is the operative pleading).

## IX. CONTROL PERSON LIABILITY IS ADEQUATELY ALLEGED

As set forth above, Plaintiffs have alleged primary violations of § 10(b) by E*TRADE. "To survive a motion to dismiss under Section 20(a) of the Exchange Act, a plaintiff need only plead facts which support a reasonable inference that [defendants] had the potential power to influence and direct the activities of the primary violator." *In re Adelphia Comm'ns Corp. Sec. & Deriv. Litig.*, 398 F.Supp.2d 244, 262 (S.D.N.Y.2005) (rejecting argument that John Rigas could not be a control person because he was not a company officer) (internal citations and quotation marks omitted). See also *CompuDyne Corp. v. Shane*, 453 F.Supp.2d 807, 829 (S.D.N.Y.2006) ("control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof").

Defendants have not challenged the fact that Simmons and Caplan are "controlling persons." Plaintiffs have also sufficiently alleged that Webb was a "controlling person." Webb oversaw all of the Company's capital markets endeavors and held multiple officer posts at E*TRADE and EGAM. ¶ 46. As CWs reported, Webb led and directly participated in E*TRADE's purchase of extremely risky loans and mortgage pools and the repackaging of these products. ¶¶ 76–77. Significantly, contrary to Defendants' argument that Webb had no involvement with issuing statements, MTD at 42, Webb spoke directly to investors during conference calls. See, e.g., ¶ 183.

## X. CONCLUSION

In light of the foregoing authorities and conclusions, Defendants' motion to dismiss is denied.

It is so ordered.